# IN THE COURT OF APPEALS OF IOWA

No. 16-1710
Filed December 20, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MARK BERNARD RETTERATH,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Mitchell County, James M. Drew (motion) and Gregg R. Rosenbladt (trial), Judges.

A defendant challenges his convictions for sexual abuse in the third degree, attempted murder, and solicitation to commit murder. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Angela L. Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Vogel, P.J., and Tabor and Bower, JJ.

**TABOR, Judge,**

Sex acts, vengeance, and castor beans. After digesting salacious testimony offered by prosecution witnesses on these subjects, a jury convicted Mark Retterath of sexual abuse in the third degree, solicitation to commit murder, and attempted murder. Retterath appeals the three guilty verdicts, challenging the sufficiency of the evidence and alleging a number of errors by the trial court.

When viewing the proof in the light most favorable to the State, we find substantial evidence to support the convictions for sexual abuse and solicitation to commit murder. But because the State did not prove Retterath performed an act that met the statutory definition of assault, we reverse and remand for dismissal of the attempted-murder count. We find no grounds for reversal in Retterath's remaining issues, though we do remand for an in camera review of the counseling records of two witnesses whose credibility was critical to the State's case on solicitation to commit murder.

## I. Facts and Prior Proceedings

According to the prosecution's theory, Retterath was reenacting a murderous plotline from an episode of *Breaking Bad*[1] as he solicited associates Aaron Sellers and J.R. to exact revenge against C.L., the young man who accused Retterath of sexual abuse.

---

[1] *Breaking Bad* was a "critically acclaimed television show" produced and marketed by AMC Networks, Inc. from 2008 to 2013. *See United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1239 n.9 (D.N.M. 2015). State's witness J.R. testified he watched the show on Netflix, a video streaming service, and shared the plot details with Retterath.

The accusations of sexual abuse surfaced in January 2015, but the events dated back more than ten years. As a young teenager, C.L. was friends with Casey Rolland, whose mother, Deb Rolland, lived with Retterath. When visiting Casey, C.L. was occasionally left alone with Retterath, who used those opportunities to introduce the topic of masturbation. Initially, C.L. told police he was thirteen years old when Retterath first touched his penis as they sat in Retterath's pickup after planting trees out in the country. C.L. recalled Retterath subtly displayed a handgun, which C.L. later believed to be a Luger, and warned C.L. not to tell his parents or Deb Rolland. During a videotaped interview, C.L. told police the touching occurred repeatedly when he was thirteen and fourteen years old.[2]

But during his trial testimony, C.L. revised his allegations, recalling instead that during his encounters with Retterath as a young teenager, each masturbated himself, and Retterath did not touch C.L.'s penis until he was sixteen years old. C.L. recalled going to Retterath's house and Retterath asking whether C.L. wanted to "pull it"—meaning to masturbate. Retterath then "leaned over and grabbed [C.L.'s penis], and looked like all around and compliment[ed C.L.] on how big [he] had gotten from the previous time [Retterath] had seen it." C.L. remembered feeling "frozen" and "powerless" to stop Retterath. The unwanted touching also occurred when C.L. was seventeen years old, according to his testimony. In high school, C.L. struggled with alcohol abuse. His parents, not knowing about the sexual encounters, urged C.L. to seek addiction counseling from Retterath.

---

[2] C.L. also remembered going to the airport hangar where Retterath worked as a crop duster.

Retterath was a recovering alcoholic and active in Alcoholic Anonymous (AA). When C.L. went to Retterath for advice, Retterath again "grabbed" C.L.'s penis.

After high school, C.L. enlisted in the Army. He served for two years before he was discharged for alcohol-related violations. Following his discharge, he developed an addiction to opiates. In the fall of 2014, C.L. overdosed on heroin and was resuscitated by his mother. Prompted by the overdose, C.L. entered treatment, and for the first time, he disclosed that he had been sexually abused by Retterath. C.L. eventually shared the information with his parents, who encouraged him to report the abuse to the police. C.L. was twenty-four years old when he detailed the abuse in an hour-long interview with Mitchell County Deputy Jeff Huftalin on January 28, 2015. During the video-recorded interview, C.L. said Retterath sometimes showed him pornography on the television while they masturbated and once Retterath tried to access a website showing child pornography on his laptop. C.L. also told police Retterath (1) had a blue-colored sword tattoo running the length of his penis and (2) joked to the teenaged C.L. that he named it "S-Excalibur." At the deputy's request, C.L. drew a picture of the tattoo, which proved to be a close likeness to the photograph later taken by law enforcement during a search of Retterath's person.

After hearing C.L.'s accusations, Deputy Huftalin arranged for C.L. to secretly record a telephone conversation with Retterath. During the call, C.L. told Retterath he had been thinking about the past when they were planting trees or watching movies together and he was having a "hard time dealing with it." Retterath claimed to have a bad connection, but Retterath also asked C.L. if he was "feeling like it was really bad or wrong?" After C.L. told Retterath he was

"getting really depressed" and had contemplated hurting himself, Retterath assured C.L. that it was "not really different than when you're alone" and "not that big of a deal."

After the phone call, police arrested Retterath and charged him with sexual abuse. Retterath admittedly was livid over C.L.'s accusations. Retterath testified: "I'm sure I've cussed him plenty. But killing him wasn't even a thought to me." The State's witnesses told a different story. Two acquaintances who met Retterath at their AA meetings testified Retterath incessantly "vented" about wanting C.L. dead. Sellers, who was thirty-five years old at the time of the trial and had spent nearly ten years in federal prison, testified Retterath repeatedly asked him to "kill that little mother fucker." Sellers did not know whether to take Retterath seriously. But Sellers initially entertained the idea out of "some loyalty" to Retterath whom Sellers believed to be falsely accused. When Sellers made it clear he would not kill C.L., Retterath asked if Sellers knew anybody who would. Retterath talked about using the silver commodities that he traded to pay someone to commit the murder, according to Seller's testimony.

Retterath also implored J.R. to kill C.L. J.R., who was twenty years old at the time of the trial, told Retterath about a *Breaking Bad* episode where ricin was extracted from castor beans and used as a poison. After that discussion, Retterath suggested J.R. should leave a ricin-laced batch of drugs on C.L.'s property where he would "stumble across it" and "hopefully would shoot it up." J.R. testified he and Retterath went to Mason City to purchase methamphetamine but Retterath decided heroin would be better because its brownish color would help disguise the ricin. Retterath wanted J.R. to plant the drugs because Retterath was the subject

of a no-contact order after the filing of the sexual abuse charges. Sellers likewise recalled the storyline: "I guess you can extract some poison from these beans and it will kill you. And it was untraceable. . . . And [Retterath] was talking about where he could find them . . . if you started looking around online."

In April 2015 Retterath signed onto eBay to purchase castor beans, along with other seeds and supplies. Retterath insisted he only wanted the poisonous beans to kill "varmints." Retterath recalled J.R. looking over his shoulder as he ordered the seeds, which prompted J.R. to recall the television episode involving ricin. Retterath also performed searches on Google related to ricin and castor beans on April 15, 2015. His search terms included "castor bean plants", "how is ricin made from castor beans,"[3] and "how fast does ricin degrade."

In June 2015 Sellers and J.R. contacted Deputy Huftalin to report Retterath's plot to kill C.L. After they came forward, the deputy obtained another search warrant for Retterath's house. In that search, investigators found a forty-plus-page printout in Retterath's file cabinet that outlined how to extract ricin from castor beans. The printout was slipped into a folder labelled Roth IRA and was entitled: "Combined Castor Marker and Isotope Profile for Ricin Forsensics: Final Report." It included five examples of ricin-purification recipes. The searchers also found a jar of castor beans in Retterath's refrigerator, as well as a baggie holding about ten beans in the pocket of a pair of Retterath's blue jeans.

In another pocket of the same jeans, the searchers found a handwritten list of the following items:

---

[3] A computer forensic expert testified the words typed in were "How is ricin" and then Google's "artificial intelligence" program "auto populated" the remainder of the query.

- 6 Big Rolls Wide Duct Tape
- 50 or 60 Large Heavy Duty Heft Bags (No draw strings if possible)
- Saws All w/3 <u>New</u> blades, 6 inches long at least
- power cord
- 2 5-gallon containers gasoline
- Large Sections of Vcqueen and/or Tarps 15 X 15 or larger[]
- your vacumm sealer (foodsaver) with the bags that aren't pre-cut
- $220 cash

Sellers testified he jotted down the list[4] as Retterath dictated it over the phone and then gave the note to him when Retterath arrived at the house. Sellers said he added the item "$220 cash" at the bottom because Retterath owed him that amount. Sellers recalled writing the note close in time to Retterath's arrest for attempted murder.

After the second search of Retterath's house and the seizure of the castor beans, investigators sought help from the seed laboratory at Iowa State University and the state hygienics laboratory in Coralville to determine if the toxin ricin was inside the castor beans. The beans tested positive for ricin. Dr. Neel Barnaby, a scientist with the FBI, testified ricin is a "biological threat agent" naturally produced from castor beans. Dr. Barnaby described ricin as a "dangerous toxin" because it "shuts down protein synthesis in cells. . . . If you kill enough cells, you start to kill tissues. If you kill enough tissues, you start to kill organs, and if you start to kill organs, you can kill the entity." Dr. Barnaby discussed different methods for extracting the toxin from the bean: "It could be as simple as cracking the seed coat open to get access to the pulp of the seed to very high-tech procedures to get 100 percent pure ricin." He testified that as few as eight beans could produce a lethal

---

[4] The State refers to the note as "a corpse-disposal shopping list." Retterath replies such a characterization is at odds with the State's theory that Retterath plotted for C.L. to die of ricin poisoning at a time and place that could not be traced to Retterath.

dose of ricin. On cross-examination, Dr. Barnaby acknowledged the FBI does not monitor the sale of castor beans on the internet.

At his jury trial in August 2016, Retterath faced three charges: sexual abuse in the third degree, solicitation to commit murder, and attempted murder. Before the presentation of the evidence, Retterath unsuccessfully moved to dismiss the charges for attempted murder and sexual abuse. *See* Iowa R. Crim. P. 2.11(6)(a). At trial, the State presented testimony from C.L., J.R., Sellers, numerous police officers, and expert witnesses. Retterath called Deb Rolland and her children as witnesses; he also testified in his own defense, denying C.L.'s allegations about the masturbation sessions and insisting he never touched C.L.'s penis. The jury returned guilty verdicts on all three counts. Retterath now appeals.

## II.      Scope and Standards of Review

The wide-ranging challenges in this appeal call for a variety of reviewing standards. When considering the district court's rulings on Retterath's motion for judgment of acquittal, objections to jury instructions, and request for admission of a video-recording over the State's hearsay objection, we review for legal error. *See, e.g.*, *State v. Tipton*, 897 N.W.2d 653, 694 (Iowa 2017) (presuming errors in jury instructions are prejudicial unless lack of prejudice is shown beyond reasonable doubt); *State v. Bash*, 670 N.W.2d 135, 137 (Iowa 2003) (upholding jury's verdict if it is supported by substantial evidence).

We employ an abuse-of-discretion standard when considering the district court's rulings on Retterath's discovery requests, mistrial motion, and motion for new trial based on the weight of the evidence. *See generally State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).

We review de novo Retterath's challenges to the search of his property and the alleged violation of his due process rights in connection with the disclosure of mental health records. *See State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997); *see also State v. Cashen*, 789 N.W.2d 400, 405 (Iowa 2010) (reviewing de novo claims resting on due process right to present a defense), *superseded by statute,* 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code § 622.10 (2011)), *as recognized in State v. Thompson*, 836 N.W.2d 470, 490 (Iowa 2013).

### III.    Analysis

### A.    Sufficiency and Weight of the Evidence

Retterath challenges both the sufficiency and the weight of the State's evidence for all three crimes. On the sufficiency question, we assess the record in the light most favorable to the State, including all reasonable inferences that we may fairly draw from the evidence. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We will uphold the jury's verdicts if they are supported by substantial evidence. *Id.* Evidence is substantial when a reasonable jury could rely on it to find the defendant guilty beyond a reasonable doubt. *Id.* Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *Id.* If the evidence is not substantial, we must reverse and remand for dismissal. *Id.*

On the alternative claim challenging the weight of the evidence, we must grant a new trial if the jury's verdicts are contrary to law or evidence. Iowa R. Crim. P. 2.24(2)(b)(6). A verdict is contrary to evidence when it is against the greater weight of the evidence presented at trial. *State v. Taylor*, 689 N.W.2d 116, 133–34 (Iowa 2004). Unlike the sufficiency standard, where the district court must approach the evidence from a standpoint most favorable to the State and assume

the truth of the prosecution's case, the weight-of-the-evidence standard allows the court to balance the evidence and consider the credibility of witnesses. *Id.* at 134. In deciding whether to grant a new trial on this ground, the district court enjoys wide discretion, but it must exercise that discretion carefully and sparingly. *Id.* We will discuss each distinct claim for all three convictions.

### 1. Sexual Abuse in the Third Degree

To convict Retterath of third-degree sexual abuse, the State had to show he performed a sex act with C.L., by force or against C.L.'s will. *See* Iowa Code §§ 709.1(1), 709.4(1)(a) (2016). One definition of "sex act" is contact between the hand of one person and the genitalia of another. *Id.* § 702.17(3). The contact must be sexual in nature. *See State v. Pearson*, 514 N.W.2d 452, 454 (Iowa 1994).

C.L. testified that when he was a young teenager, he had encounters with Retterath where they both would masturbate, without touching the other, but Retterath would display a handgun. Retterath told C.L. not to tell his parents what happened. C.L. further testified, on two occasions when he was sixteen and then seventeen years old, he was again alone with Retterath when the older man raised the subject of masturbation and "grabbed" C.L.'s penis—complimenting its size. C.L. recalled Retterath telling him "the girls are going to like that."

Retterath argues that even if the jury believed C.L., his testimony did not establish the sexual nature of the touching. He claims the State offered no evidence to indicate that Retterath's admiration for the growth of C.L.'s penis was intended to arouse or satisfy the sexual desires of either party. We disagree. The jury was entitled to determine that Retterath's act of grabbing C.L.'s penis was sexual in nature based on the type of contact and the circumstances surrounding

it. *See State v. Madsen*, 813 N.W.2d 714, 728–29 (Iowa 2012) (deciding "admissible evidence allowed the jury to find Madsen measured D.M.K.'s penis with the specific intent to arouse or satisfy sexual desires" (citation omitted)). C.L. testified Retterath had pornography playing for them to view as both Retterath and C.L. proceeded to masturbate while sitting side by side on the couch. According to C.L., Retterath then asked C.L. "if [he] was close because [Retterath] was close," meaning Retterath wanted them to ejaculate at the same time. In these circumstances, Retterath's sexual intent was obvious.

As to the weight of the evidence, we find no abuse of discretion in the district court's denial of a new trial. *See Taylor*, 689 N.W.2d at 134 (discussing limited appellate review). Retterath's challenge focuses on C.L.'s credibility—pointing out C.L.'s late reporting and the variance between C.L.'s initial disclosures and trial testimony. The district court could uphold the jury's verdict despite those concerns. The State offered expert testimony to explain that traumatic situations can make it difficult for young people to remember time frames and to explain why delayed disclosure is common. In addition, C.L.'s credibility was bolstered by his accurate drawing of the sword tattoo on Retterath's penis, something he would not have been able to remember if Retterath was truthful in his total denial of any masturbation sessions with C.L. Finally, Retterath's statements during the recorded phone call with C.L. give credence to C.L.'s allegations of sexual abuse.

Accordingly, we uphold the district court's rulings on both the sufficiency and the weight of the evidence supporting Retterath's conviction for sexual abuse in the third degree.

At this juncture, we circle back to address Retterath's related claim that the district court should have granted his pretrial motion to dismiss the count alleging sexual abuse. Pretrial dismissal is appropriate if the facts alleged in the trial information and the minutes of evidence do not constitute the offense charged as a matter of law. *State v. Gonzalez*, 718 N.W.2d 304, 309 (Iowa 2006). In considering a motion to dismiss a trial information, the district court is called to accept as true the facts set out in the minutes or any bill of particulars. *See State v. Doss*, 355 N.W.2d 874, 881 (Iowa 1984).

Retterath argued in his motion to dismiss that neither the minutes nor C.L.'s deposition[5] alleged that he "performed a sex act on C.L. by force or against his will." Retterath claims that even if the acts alleged in C.L.'s deposition were sexual, they were not "done by force or against the will of C.L." The defense points out C.L. went to Retterath's house on his own accord and agreed to masturbate. In Retterath's estimation: "This is not the behavior of someone who is being forced to do something against his will."

"The overall purpose of Iowa's sexual abuse statute is to protect the freedom of choice to engage in sex acts." *State v. Meyers*, 799 N.W.2d 132, 143 (Iowa 2011). The phrase, "against the will of another," provides broad protection from nonconsensual sex acts, both under circumstances showing the victim had no opportunity or ability to consent due to coercion and where the particular

---

[5] The State insists that in evaluating the motion to dismiss, we cannot consider C.L.'s deposition. *See State v. Johnson*, 528 N.W.2d 638, 640 (1995). We disagree. Because C.L.'s deposition contradicted information contained in the minutes of evidence, it can be construed as an amendment or bill of particulars and is properly considered in deciding whether the facts alleged constitute the offense charged. *See generally State v. Conner*, 292 N.W.2d 682, 688 (Iowa 1980).

circumstances have rendered the victim incapable of consenting to the sexual advances of a particular person. *Id.* In his deposition, C.L. testified to coercive actions Retterath had taken during earlier masturbation encounters, including leaving a gun visible to C.L. and warning him not to tell Deb Rolland or his parents.

Under these circumstances, we conclude the State alleged sufficient facts to support the elements of sexual abuse in the third degree; the district court properly denied Retterath's motion to dismiss this offense.

### 2. Solicitation to Commit Murder

We turn next to Retterath's challenge to his conviction for the solicitation of J.R. or Sellers to murder C.L. Solicitation to commit murder has three elements: (1) commanding, entreating, or otherwise attempting to persuade another to commit murder; (2) with intent that the murder be committed; (3) under circumstances corroborating that intent. Iowa Code § 705.1(1); *State v. Jackson*, 422 N.W.2d 475, 478 (Iowa 1988). Retterath alleges there was insufficient evidence to corroborate the testimony of Sellers or J.R. A conviction for this crime cannot rest on the testimony of a solicited person "unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Iowa R. Crim. P. 2.21(3).

The purpose of corroborating evidence is to ensure a conviction does not result from an accused's statements that were misunderstood, not intended to be taken seriously, or fabricated by the solicited person. *State v. Williams*, 315 N.W.2d 45, 58 (Iowa 1982). We do not require corroborative evidence to be particularly strong as long as it tends to connect the accused with the commission

of the crime and supports the credibility of the solicited person. *See generally State v. Barnes*, 791 N.W.2d 817, 824 (Iowa 2010); *State v. Robertson*, 351 N.W.2d 790, 793 (Iowa 1984).

On appeal, Retterath asserts: "Wanting to kill someone, indeed fantasizing and talking about killing someone, is not sufficient evidence of intent to actually have someone killed." He contends he is being punished for a "thought crime."

The State argues "solicitation is an offense 'where the crime is in the asking.'" *State v. Anderson*, 618 N.W.2d 369, 372 (Iowa 2000) (citation omitted). The State also points out "the ultimate success or failure of the solicitation is irrelevant to the validity of the conviction." *Cf. State v. Propp*, 532 N.W.2d 784, 786 (Iowa 1995) (analyzing conviction for solicitation of a child to engage in a sex act). As corroborative evidence, the State points to Retterath's accelerated buying of silver as a means for him to afford the murder for hire, as well as his purchase of the castor beans and printing of the ricin fact sheet, which connect him to the criminal plot described by both Sellers and J.R.

Viewing the proof in the light most favorable to the State, we find sufficient evidence to corroborate the testimony of Sellers and J.R. Both men testified about Retterath's expressed desire to have them lace C.L.'s drugs with ricin. Sellers testified Retterath was excited when the castor beans arrived and showed the delivery box to Sellers. J.R. testified Retterath showed him a pill bottle containing castor beans, as well as the "larger bag of beans in the fridge." Investigators confirmed Retterath's possession of the beans. The district court properly denied Retterath's motion for judgment of acquittal on the solicitation offense.

As for the weight of the evidence, we find no abuse of discretion in the district court's denial of Retterath's motion for new trial on the solicitation count. While the defense raised questions about the credibility of J.R. and Sellers during their cross-examinations, assigning proper weight to their testimony remained the job of the jury. The district court is not to substitute its judgment for that of the jury unless the credible evidence tipped the scales heavily away from the verdict. *See State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). Moreover, the corroborative evidence here was not subject to questions of trustworthiness. We will not disturb the jury's verdict on the solicitation offense.

### 3. Attempted Murder

On the offense of attempt to commit murder, the district court instructed the jury that the State had to prove three elements: (1) Retterath attempted to kill C.L. by poisoning him with ricin; (2) by his acts he expected to set in motion a force or chain of events which would cause or result in C.L.'s death; and (3) when he acted he specifically intended to cause C.L.'s death. *See* Iowa Code § 707.11(1); *State v. Ceretti*, 871 N.W.2d 88, 92 (Iowa 2015) (condensing attempted murder into two elements: "(1) an act, (2) done with intent to cause another person's death"); *State v. Young*, 686 N.W.2d 182, 185 (Iowa 2004) (describing elements as "(1) a specific intent to cause the death of another and (2) an overt act in furtherance of the required specific intent").

Relying on *State v. Braggs*, 784 N.W.2d 31 (Iowa 2010), Retterath argues the State did not satisfy the elements of attempted murder because it did not prove he assaulted C.L. *Braggs* held "it is impossible to commit attempted murder without also performing an act which meets the statutory definition of an assault

under Iowa Code section 707.1(1)." 784 N.W.2d at 36–37. Retterath argues the evidence he solicited J.R. and Sellers to poison C.L. and also purchased castor beans are not acts rising to the level of an assault. Retterath asserts: "Castor beans are legal to possess and grow, and the mere possession of castor beans, without an attempt to extract ricin, let alone no use of any theoretical ricin to poison anyone, is not a 'chain of events' that would result in the death of another."

The State insists the conduct required for attempted murder is not always an assault because "the inchoate nature of attempted murder means it can be committed through acts taking place *before* a planned assault." The State cites *Braggs* for the proposition that as a result of the 1978 code revisions, "an assault is no longer an express element of attempted murder." *Id.* But the State isolates what appears to be favorable language while ignoring *Braggs's* ultimate determination that assault remains an essential element of attempt to commit murder. *Id.* at 36–37 (explaining the defendant's "focus on the 1978 rewrite of the Iowa Code is misplaced" because it is not essential that elements of a lesser offense be described in the statutes in the same manner as described in the elements of the greater offense).

To support its position that not all attempted murders are accomplished by assaults, the State points to our unpublished decision in *State v. Leggio*, No. 09-0990, 2010 WL 624221, at *5 (Iowa Ct. App. Feb. 24, 2010). The State asserts: "The obvious example is murder-for-hire, which constitutes attempted murder long before the intended victim becomes aware of the scheme's existence." In *Leggio*, our court upheld a conviction for attempted murder that was based on a completed murder-for-hire agreement. 2010 WL 624221, at *5.

While it may be difficult to reconcile *Braggs* and *Leggio*, we must follow the precedent established by our supreme court. Accordingly, we reject the State's reading of *Braggs*. Specifically, *Braggs* explained: "Attempted murder requires that the person expects to do something which will cause or result in the death of another." 784 N.W.2d at 37 (citing Iowa Code § 707.11). That "something" is an assault as defined in section 708.1.[6] *Id.* The ability to complete the harmful act need only be apparent to the actor, not the victim. *Id.*

In the State's example, even if the victim were not aware of the existence of a murder-for-hire scheme, the person who set in motion the chain of events could commit an assault by having the apparent ability to execute the harmful act vicariously through the hired assassin. *See, e.g, People v. Super. Ct.*, 157 P.3d 1017, 1022–23 (Cal. 2007) ("Although Decker did not himself point a gun at his sister, he did aim at her an armed professional who had agreed to commit the murder."). Under this reasoning, *Leggio* would not be inconsistent with *Braggs*. In *Leggio*, the defendant supplied the would-be assassin with information about the targeted victims, such as maps, photographs, work schedules, and vehicle types; "Leggio understood that his plan to have the intended victims killed was irretrievable once he signed and returned the promissory note." 2010 WL 624221, at *5. By contrast, Retterath's scheme to kill C.L. was in its nascent stage.

---

[6] Iowa Code § 708.1(2) states:

> A person commits an assault when, without justification, the person does any of the following: a. Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act. b. Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Retterath was not shy about expressing his desire for C.L.'s demise. But he had not secured an agreement from Sellers or J.R. to carry out the killing and had taken no more than exploratory steps on his own to achieve his goal.

Having confirmed that, under *Braggs*, the State was required to prove an assault, we examine whether the State presented substantial evidence showing Retterath committed such an "overt act" by which he expected to set in motion a force or chain of events that would cause or result in C.L.'s death. *See* Iowa Code § 707.11(1); *Young*, 686 N.W.2d at 185. "Attempt" is not defined in our criminal code, but we know from our caselaw it is a matter of degree. "[M]ere acts of preparation not proximately leading to the consummation of the intended crime will not suffice to establish an intent to commit it." *State v. Spies*, 672 N.W.2d 792, 797 (Iowa 2003) (quoting *State v. Roby*, 188 N.W. 709, 714 (Iowa 1922)). But the overt act also "need not be the last proximate act to the consummation of the offense." *Id*. An overt act qualifies as an "attempt" if it reaches "far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." *Id*. (deciding that act of driving car toward supplier, after Spies participated in conversation consistent with confirming drug sale, qualified as step beyond preparation and proved attempt to transfer methamphetamine).

The State points out that Iowa follows the "slight acts" approach to proving conduct has gone beyond "mere preparation" to a full-fledged attempt. *See Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982) (describing common law elements of attempt as "(1) intent to commit the crime and (2) slight acts in furtherance of the crime that render voluntary termination improbable"). The State contrasts the "slight acts" test with the "substantial step" formulation in the Model Penal Code.

*See* Model Penal Code § 5.01(1)(c) (Am. Law Inst. 2016) (defining attempt as including an act that constitutes "a substantial step in a course of conduct planned to culminate in the commission of a crime").[7]  Like federal courts that have looked at the "semantic disconnect" between the "slight acts" and "substantial step" formulations, we see the "operational meaning" of "attempt" as the same under either standard.  *See United States v. Saavedra-Velazquez*, 578 F.3d 1103, 1109 (9th Cir. 2009) (noting California courts have suggested the "slight acts" test is actually more stringent than the "substantial step" requirement because the Model Penal Code permits, in certain circumstances, preparatory acts to constitute an "attempt"); *see also United States v. Sanchez*, 667 F.3d 555, 563 (5th Cir. 2012) (describing "substantial step" as an act strongly corroborative of the actor's criminal intent amounting to more than mere preparation); *United States v. Kriens*, No. CR 99-3003 MWB, 2006 WL 2089947, at *13 (N.D. Iowa July 25, 2006) (equating Iowa's "slight acts" test with "substantial step" language).

The State argues that Retterath satisfied the "slight acts" test by buying the castor beans and researching how to extract ricin from them.  The State contends,

---

[7] The Model Penal Code lists seven types of conduct that could constitute a "substantial step" if strongly corroborative of the actor's criminal intent, namely: (1) lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; and (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.  Model Penal Code § 5.01(2)(a)–(g).

even if Retterath had a lawful use for the beans, he had no lawful use for ricin—"so his momentum towards producing it can prove attempted murder." The State alternatively asserts Retterath's solicitations of J.R. and Sellers to kill C.L. were independently sufficient to prove attempted murder.

After considering both of the State's alternatives, we cannot conclude Retterath engaged in even a "slight act" in furtherance of his intent to kill C.L. that rendered voluntary termination of the scheme improbable. Retterath expressed his desire to have C.L. killed, purchased castor beans, "Googled" how to make ricin, printed instructions from the Internet, and solicited (unsuccessfully) two associates to help him plant tainted drugs around C.L.'s home because Retterath had a no-contact order prohibiting him from going there. Retterath stored most of the castor beans in his refrigerator, but he stashed a few beans in a baggie in the pocket of jeans he was not wearing at the time of his arrest. Notably, Retterath had not taken a step to extract ricin from the castor beans. He had no poison. He did not lie in wait or search for C.L.; he did not case a location for the crime; he did not entice C.L. to such a place, nor enter a structure for the purpose of committing the crime. He did not possess the castor beans at the place contemplated for the commission of the crime.[8] As for the solicitation, the facts here were not like *Leggio*, 2010 WL 624221, at \*5 (emphasizing Leggio's understood plan to have intended victims killed was irretrievable once Leggio signed and returned

---

[8] In its closing argument, the prosecution told the jury that Retterath's possession of the castor beans was like "carrying around a loaded gun in his pocket." But unless Retterath had been carrying a loaded gun in the vicinity of the contemplated victim or had at least been moving in that direction, the State would be hard-pressed to convict him of attempted murder under Iowa Code section 707.11. *See generally Young*, 686 N.W.2d at 185–86 (discussing defendant's act of shooting rifle at deputy's vehicle as "type of act that would further the specific intent to commit attempted murder").

promissory note). Retterath's entreaties to Sellers and J.R. were preliminary; no consideration was exchanged. The State failed to offer proof of an overt act—meeting the definition of an assault—that went far enough to convict Retterath of attempt to murder. Accordingly, we reverse his attempted-murder conviction and remand for dismissal of that count.[9]

### B.  Search Warrants

Retterath next alleges a violation of his right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Retterath contends the district court erred in denying his motion to suppress evidence seized during the execution of search warrants issued in late January and early February of 2015 for his house, vehicles, and airplane hangar.[10] He argues the information presented in the warrant applications was stale, and as a result, the officers lacked probable cause for the searches. The applications stemmed from C.L.'s report to the police in January 2015 that he had been sexually abused by Retterath starting in 2004 and continuing until November 2012.

---

[9] Because we find insufficient evidence to support Retterath's conviction under section 707.11, we decline to address his claims concerning his pretrial motion to dismiss, the weight of the evidence, or the jury instructions as they relate to the conviction for attempted murder.

[10] The warrant also authorized a search of Retterath's body for any tattoos. He does not challenge that search on appeal. In addition, Retterath does not challenge the second round of warrants that resulted in the seizure of the castor beans.

Probable cause requires a reasonable belief that evidence of a crime will be found on the premises to be searched; the information upon which this belief is based must be current and not remote in time. *See State v. Randle*, 555 N.W.2d 666, 670 (Iowa 1996). Along with the passage of time, courts consider (1) the nature of the crime (isolated or ongoing), (2) the character of the suspect (nomadic or stable), (3) the nature of thing to be seized (perishable, easily destroyed, enduring utility to holder), and (4) the place to be searched (forum of convenience or secure base). *Gogg*, 561 N.W.2d at 367.

The affidavit attached to the warrant application discussed C.L.'s allegations of being sexually abused by Retterath, as well as the officer's experience concerning the link between persons who sexually abuse children and the acquisition of child pornography. The warrant sought computers, other types of records and media, and firearms and ammunition. While executing the warrants in this case, officers seized computers and guns, as well as a small amount of marijuana and drug paraphernalia. In resisting the motion to suppress, the State acknowledged its seizure of the drugs was invalid but urged the remaining evidence was properly seized because the sexual abuse was ongoing and a connection existed between child pornography and sexual abuse.

On appeal, Retterath argues, "The only information in the warrant for which there could ever have been evidence of a 'crime' was C.L.'s claim that 'on one occasion,' on an undisclosed date, Retterath had child pornography on his computer." Retterath points out the alleged viewing of child pornography was more than two years—and possibly as long as ten years—before the State's execution

of the warrants.  He argues the district court should have excluded evidence of adult pornography and guns found on his property.

The State acknowledges the information contained in the application was not current but defends the issuance of the warrants under *Gogg*.  The State argues the district court correctly relied on the ongoing nature of the sexual abuse to justify the State's search for evidence of child pornography.  The State alternatively contends the evidence seized was "barely mentioned at trial" and thus the denial of Retterath's motion to suppress was harmless error.  In reply, Retterath accuses the State of mischaracterizing the record, noting the adult pornography and guns found on his property were discussed numerous times during the trial.

Upon our de novo review, we reach the same conclusion as the district court.  On balance, the ongoing nature of the sexual abuse alleged by C.L. overcomes Retterath's staleness claim.  In contrast to theft, robbery, or drug cases where law enforcement should expect the suspect to move any evidence fairly rapidly, authorities could reasonable believe a suspect would retain child pornography or other items used to sexually exploit children for a longer period of time.  *See State v. Woodcock*, 407 N.W.2d 603, 605 (Iowa 1987) ("Their perceived usefulness to the suspect would be of a continuing nature, through gratification obtained by him.").  The district court properly overruled Retterath's motion to suppress.

## C.    Production and Disclosure of Privileged Records

Retterath also criticizes the district court's response to his request for privileged records.  A defendant seeking access to privileged records must demonstrate "in good faith a reasonable probability that the information sought is

likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." Iowa Code § 622.10(4)(a)(2)(a). If a defendant makes such a showing, the district court will perform an in camera review to determine if the records indeed contain exculpatory evidence. *Id.* at § 622.10(4)(a)(2)(b). The court then performs a balancing test—weighing the need for the disclosure versus the witness's privacy interest. *Id.* at § 622.10(4)(a)(2)(c).

At trial, Retterath sought confidential records from the providers of mental-health treatment to C.L., Sellers, and J.R. The district court denied Retterath's requests for the records of Sellers and J.R., but it performed an in camera review of C.L.'s records. After reviewing hundreds of pages detailing C.L.'s treatment, the district court turned over a single page of C.L.'s medical history to Retterath's counsel that the court determined contradicted C.L.'s allegations of sexual abuse. When rejecting Retterath's requests for an in camera review of the records of Sellers and J.R., the court distinguished between the categories of "impeaching" and "exculpatory" evidence.

On appeal, Retterath contends the district court erred in its analysis concerning the records of Sellers and J.R. He also argues—to the best of his knowledge—the court should have released the entirety of C.L's records.

Turning to the records of Sellers and J.R., Retterath argued both witnesses for the State had mental-health and substance-abuse disorders that would bear upon the truthfulness of their testimony. Retterath asserted Sellers experienced "auditory hallucinations which are severe enough to warrant him receiving disability payments from Social Security." In a separate motion, Retterath alleged J.R.

"portrayed symptoms" associated with a mental illness, discussed being "fuzzy" on certain facts during a deposition, and had been transported from a hospital psychiatric unit. The State resisted Retterath's motions, arguing the records would contain "only impeachment evidence as opposed to exculpatory evidence." The district court accepted the State's position.

Legislative drafters used the term "exculpatory" repeatedly in section 622.10(4) but did not define it. Exculpatory evidence tends to "establish a criminal defendant's innocence." *Exculpatory Evidence*, Black's Law Dictionary (10th ed. 2014).

On appeal, Retterath argues that in a "he said/he said" case like this, impeachment evidence is the only exculpatory evidence available. In response, the State cautions that we must construe section 622.10(4) with the realization that the legislative purpose was to supersede the test from *Cashen*, 789 N.W.2d at 417, with "a protocol that restores protection for the confidentiality of counseling records," *see Thompson*, 836 N.W.2d at 481. Under the State's logic, "If impeachment evidence qualified as 'exculpatory' under section 622.10(4), then every conceivable mental health record could be discoverable," and the legislature's aim to protect confidentiality would be undermined.

We disagree with the State's narrow reading of "exculpatory." In the context of discovery for *Brady* purposes, the United States Supreme Court has rejected any distinction between "impeachment" evidence and "exculpatory" evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Likewise in *State v. Edouard*, our supreme court remanded for an in camera review of a witness's counseling records because information in the records "could have significantly undermined

[that witness's] testimony." 854 N.W.2d 421, 442 (Iowa 2014), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016); *see also Neiderbach*, 837 N.W.2d at 226 (stating "all that is required is some plausible theory founded in demonstrable fact that suggests the information in the mental health records might well prove helpful to the defense"). Retterath established that Sellers and J.R. each had a history of psychiatric conditions that could impact his reliability as a witness. The defense made a plausible showing (1) exculpatory evidence could be unearthed in their mental health records and (2) the critical information was not available from another source. *See Neiderbach*, 837 N.W.2d at 220. We remand the case to allow the district court to conduct that review under section 622.10(4)(a)(2) to determine whether their records contain exculpatory information. If the district court finds no exculpatory evidence, Retterath's conviction for solicitation to commit murder is affirmed. If the district court finds exculpatory evidence in those records, then the district court should perform the balancing test outlined in paragraphs (2)(c) and (d) to assess whether Retterath is entitled to a new trial on the conviction for solicitation to commit murder.

As for C.L.'s records, we have reviewed in camera the nearly five hundred pages of confidential information as provided for in section 622.10(4)(a)(2)(a). After weighing the need for the disclosure against C.L.'s privacy interest, we find no additional exculpatory evidence that should be disclosed to Retterath. Accordingly, we affirm as to Retterath's request for additional records concerning C.L. records.

### D.    Exclusion of C.L.'s Videotaped Interview

Retterath also contests the district court's decision to exclude the video-recording of C.L.'s interview with Deputy Huftalin in January 2015. During C.L.'s cross-examination, Retterath's counsel asked for the entire video to be shown to the jury for impeachment purposes. The State resisted, arguing defense counsel could "impeach the witness all she wants, but the tape itself does not come in as evidence." The district court ruled the video could not be admitted because it was hearsay, but the court marked it as an offer of proof for appeal.

Retterath's counsel argued the videotaped interview was not excludable as hearsay because the statements were not being offered for the truth of the matter asserted—"[c]learly we don't think it's true." Counsel further asserted: "Best evidence is to listen to the video. He's not reporting on cross-examination what the video is saying accurately. And so I think the jury could get to hear that."

The district court rejected the defense argument, reasoning, "[W]e should be handling that through the normal impeachment process of asking a witness about it, and he could either confirm or deny it, that he'd made those prior statements." The court did offer to play the video for the jurors without sound so the jurors could see C.L. as he answered questions, but defense counsel declined: "You need to be able to hear how he's saying, what he's saying, his responses, whether he's forthcoming or not."

On appeal, Retterath reiterates his position the video was not hearsay. *See* Iowa R. Evid. 5.801(c). Retterath also argues the video was admissible to rebut Deputy Huftalin's testimony that C.L.'s "general demeanor" during the interview was "embarrassment" and "maybe a little bit of shame."

In response to Retterath's argument that he was not offering the video for the truth of the matter asserted, the State contends: "This implies some substantive, non-impeachment purpose for introducing the entire video—but at trial and on appeal, the only purported purpose given for offering this as substantive evidence was that it demonstrated C.L.'s demeanor."  The State's response conflates offering out-of-court statements to prove the truth of the matter asserted and offering such statements for impeachment purposes.  "A prior statement of a witness used to impeach the witness's testimony is not hearsay when the statement is not offered to prove the truth of the statement, but rather to prove the fact the witness made a statement at a previous time."  *State v. Sowder*, 394 N.W.2d 368, 370 (Iowa 1986); *see* Iowa R. Evid. 5.801(c).  We look to the real purpose for offering the out-of-court statement.  *See State v. Belken*, 633 N.W.2d 786, 801 (Iowa 2001).  Here, Retterath wanted to impeach C.L. with his earlier version of events and would not have attempted to establish the truth of his assertions in the video.  Accordingly, the district court erred in excluding the video recording.

But the question remains whether Retterath was prejudiced by exclusion of the video recording.  The State argues any error in excluding it was harmless because "the full interview video as evidence of C.L.'s demeanor would have been hugely advantageous to the State."  Retterath expresses sharp disagreement in his reply brief, contending the video was "highly exculpatory" because it would have allowed the jurors to make a more informed credibility determination about C.L.  Where, as here, the proponent of the evidence alleges contravention of a rule rather than a constitutional violation, we reverse only if "the complaining party has

suffered a miscarriage of justice or his rights have been injuriously affected." *State v. Lukins*, 846 N.W.2d 902, 911 (Iowa 2014). We presume prejudice unless the record shows otherwise. *Id.*

Our review of the record shows Retterath's rights were not injuriously affected by the court's exclusion of the video recording. Defense counsel vigorously cross-examined C.L. concerning his earlier inconsistent statements. The jurors were well aware of C.L.'s revision of his original allegations that Retterath touched his penis on numerous occasions when C.L. was thirteen and fourteen years old. Moreover, C.L.'s demeanor in the video recording is susceptible to different interpretations. His legs are constantly jittery, and at various times he shifts in his chair, hangs his head, and chews his fingernails. C.L.'s body language could mean, as Retterath alleges, that C.L. was "someone making up details as [he] went along." Or alternatively, it could reveal, as the deputy perceived, that C.L. was embarrassed and ashamed to discuss being sexually abused as a youth. Based on this ambiguity, we do not find Retterath suffered a miscarriage of justice by the exclusion of this evidence.

### E. Jury Instructions

Retterath contends the district court provided several faulty instructions to the jury. We will address each challenged instruction in turn.

### 1. Unanimity Requirement

Iowa Rule of Criminal Procedure 2.22(5) requires unanimity in criminal jury verdicts. This unanimity requirement is not violated when jurors embrace different theories for the crime, as long as the alternative theories are not repugnant to each other. *See State v. Bratthauer*, 354 N.W.2d 774, 776 (Iowa

1984); *see also State v. Schlitter*, 881 N.W.2d 380, 399 (Iowa 2016) (Wiggins. J., concurring in part and dissenting in part) (discussing need for special interrogatories and opining "juror unanimity as to the means by which an offense was committed is required to sustain a conviction when the alternative means submitted to the jury are inconsistent, repugnant, or conceptually distinguishable from each other").

At trial, Retterath objected to Instruction No. 18, a uniform jury instruction providing: "Where two or more facts would produce the same result, the law does not require each juror to agree as to which fact leads to his or her verdict. It is the verdict itself which must be unanimous, not the facts upon which it is based." The district court overruled that objection.

On appeal, Retterath contends Instruction No. 18 was an incorrect statement of the law. In his view, the instruction allowed the jurors to convict him even if they did not all agree who he solicited, when the solicitation occurred, or under what conditions. Indeed, the State argued in closing: "There's two people involved in this solicitation. Half of you could say, I think he just solicited [J.R.]. The other half of you could say, I think he just solicited Aaron Sellers. But the bottom line is you all agree that a solicitation was done."

But Retterath did not object to the marshalling instruction stating the jury must find he solicited "another" to commit murder, not specifying whether another referred to Sellers or J.R. As the State argues on appeal, even if the district court had removed Instruction No. 18 from the jurors' consideration, they could have still viewed the solicitation theories in the disjunctive under the un-objected-to marshalling instruction. Moreover, Retterath does not contend on appeal that the

prosecutor misstated the law on unanimity in closing argument. Accordingly, Retterath did not preserve error on his claim concerning a unanimous verdict.

## 2. Range of Dates for Sexual Abuse

Retterath argues the district court erred in overruling his objection to the time range in the marshalling instruction for sexual abuse because C.L. did not allege in his testimony that sex acts occurred in 2003 or 2004. The State argues the earlier dates were properly included because C.L. testified to Retterath's sexual advances during that time frame, even if C.L. did not allege that a sex act occurred until several years later. While the dates used in the marshalling instruction should have reflected the testimony offered by C.L., we cannot conclude the mistake warrants a new trial. *See State v. Griffin*, 386 N.W.2d 529, 532 (Iowa Ct. App. 1986) (allowing less specificity regarding date of sexual abuse alleged by children).

## 3. Specific Intent for Solicitation

Retterath contends the district court improperly instructed the jury on the elements of solicitation to commit murder because the marshaling instruction did not mention "specific intent." Instead, the jury was told the State must prove: "The defendant intended that the murder would be committed."

We conclude the instruction properly reflected the elements of the offense. *See* Iowa Code § 705.1 (requiring proof that person soliciting another to commit a felony had "intent that such act be done"); *see also State v. Hall*, 150 N.W. 97, 104 (Iowa 1914) (holding an instruction following the language of the statute is not prejudicial where other instructions fully cover the law as applied to the issue). The district court separately instructed the jury on specific intent. Moreover, the

prosecution told the jurors in closing arguments that they were required to find specific intent for both attempted murder and solicitation to commit murder. The jury could not have been misled as to the intent element.

### F.      Motion for Mistrial

Retterath filed a motion in limine seeking to exclude "any testimony, argument, or inference that the defendant committed any act of sex abuse in regards to [J.R.]." The court agreed to the exclusion. But during the State's case in chief, several witnesses violated the limine ruling. For example, Iowa Division of Criminal Investigation Agent Scott Reger testified Retterath wanted to "kill one of the victims using castor beans and ricin." During his direct examination, Sellers referred to Retterath being charged "with a couple of different crimes" and tried to clarify a point with the prosecutor by asking: "This is right before he was charged with the second thing, right?" Sellers also testified, "I know it was longer than less than two weeks before he was charged with yet another victim."

In response to these statements, defense counsel moved for a mistrial, contending that although the information was not purposefully elicited by the prosecution, it was nevertheless "highly prejudicial." The court denied the motion, reasoning: "I do not think the way it came in . . . would really give the jury any clue, actually, that there was another sexual abuse charge out there."

Then during closing arguments, the prosecutor inadvertently substituted J.R.'s name for C.L.'s name. The prosecutor recounted Retterath's testimony: "He had an answer for everything. . . . Did you ever touch [J.R.]? No. Did you ever masturbate [J.R.]? No. Did you ever masturbate in front of [J.R.]? No. Just kept saying no, no, no."

Retterath raised the limine violations again in moving for a new trial. The State argued the challenged instances did not alert the jury to the other-bad-acts evidence:

> [T]he attorneys knew that there was a second victim. The jury did not. So when they hear these statements regarding, one of the victims or when I accidently said [J.R.] instead of [C.L.], what the jury is probably thinking is they just mistakenly switched up the names, or we were talking about the two separate times that the defendant was convicted.

The court denied the motion for new trial, finding the violations did not have "a possibility of impacting [the jury's] decision."

The district court enjoys wide discretion in denying a mistrial because "it is in the best position to appraise the effect of any alleged misconduct." *State v. Frei*, 831 N.W.2d 70, 80 (Iowa 2013), *overruled on other grounds by Alcala*, 880 N.W.2d at 699. We find no abuse of that discretion in regard to these passing references to a second victim.

### G.    Motion for New Trial/Prosecutorial Misconduct

In his final assignment of error, Retterath claims he is entitled to a new trial based on prosecutorial misconduct. The alleged misconduct involved the State's effort to prove Retterath owned a Luger handgun.

C.L. testified that when he was a young teenager and had a sexual encounter with Retterath in his pickup, the older man showed him a handgun. While C.L. did not know what kind of gun it was at the time, in retrospect, he believed it was a Luger. Retterath testified he never owned a Luger. As rebuttal, the State offered into evidence a photograph showing an owner's manual for a Luger pistol; the manual was found during the warranted search of Retterath's filing

cabinet. Retterath testified in surrebuttal that he sometimes purchased manuals for guns he did not own.

Retterath discovered after the trial that the photographed manual was published in 2009, which means the evidence could not support the inference that Retterath owned a Luger in 2004 or 2005, when C.L. testified he saw it and felt threatened to engage in masturbation with Retterath. In closing argument, the State told the jury Retterath was "trying to separate himself from having the Luger when [C.L.] was 13 years old." The prosecutor argued: "So he's saying, I bought that manual around this time when all of this was going on . . . . [L]ook at the Ebay record. There's nothing in there that he bought a Luger manual. He is not being honest with you."

In his motion for new trial, Retterath alleged prosecutorial misconduct based on the discussion of the Luger manual. The district court declined to grant a new trial on that ground, explaining:

> The evidence regarding that particular pamphlet was fairly brief, and it's the Court's recall that the defendant testified that he never owned a Luger-type pistol. . . . The exhibit that's been introduced here was found in the home . . . and that would have an impact on the defendant's credibility and the statements about never having owned or had a Luger pistol.

On appeal, Retterath argues the State's use of the photograph in rebuttal violated his right to due process and warrants a new trial.[11] The State rejects the

---

[11] Retterath also argues the State's use of the manual violated his right to receive exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). But this argument is a non-starter because the State never actually seized the manual from Retterath and it turned over the photograph of the manual during discovery.

claim of wrongdoing, asserting the manual became relevant impeachment evidence when Retterath testified he *never* owned a Lugar pistol. We agree the State was entitled to highlight the question of Retterath's credibility for the jurors. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003) (synthesizing our prosecutorial-misconduct doctrine). The district court did not abuse its discretion in denying Retterath's motion for new trial alleging prosecutorial misconduct.

### IV.    Summary

To recap, we affirm Retterath's convictions for sexual abuse in the third degree and solicitation to commit murder. We reverse his conviction for attempt to commit murder and remand for dismissal. We also remand for the district court to conduct an in camera review of the mental-health and substance-abuse medical records of Sellers and J.R. concerning the solicitation to commit murder conviction.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**