# IN THE SUPREME COURT OF IOWA

No. 13–1997

Filed February 19, 2016

Amended May 6, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**TAQUALA MONIQUE HOWSE,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Jeffrey Harris, Judge.

The court of appeals held there was insufficient evidence in the record to establish that an inoperable stun gun was a dangerous weapon and reversed the decision of the district court. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

John Audlehelm of Audlehelm Law Office, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Des Moines, Thomas J. Ferguson, County Attorney, and Emily Zerkel, Assistant County Attorney, for appellee.

**ZAGER, Justice.**

In this appeal, the defendant asks us to decide whether there was sufficient evidence in the record to conclude an inoperable stun gun—or a stun gun that has not been shown to be operable—qualifies as a dangerous weapon under Iowa Code section 702.7 (2011). The State argues that our previous opinion in *State v. Geier*, 484 N.W.2d 167 (Iowa 1992), controls, or alternatively, that this case only involves statutory interpretation of Iowa Code section 702.7 and error has not been preserved. We conclude that a stun gun is per se a dangerous weapon as defined in the statute. Therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

On June 23, 2013, Officer Kyle Jurgensen of the Waterloo Police Department was dispatched to the Wal-Mart in Waterloo based on a report of two individuals stealing items from the store. When Officer Jurgensen arrived, he spoke with Wal-Mart's asset protection person who was able to identify the two suspects. Officer Jurgensen placed both individuals under arrest. Defendant Taquala Howse was one of the two suspects identified by Wal-Mart's asset protection person.

When Officer Jurgensen placed Howse under arrest for theft, he placed her in handcuffs and then escorted her to his vehicle. Before placing Howse in his vehicle, Officer Jurgensen conducted a search of the purse Howse was carrying. Inside the purse he discovered a small hand-held stun gun. Howse admitted she had purchased the stun gun and carried it with her to clubs. Officer Jurgensen asked Howse if she had a permit to carry the stun gun, and she responded that she did not. Officer Jurgensen verified that Howse did not have a permit to carry the stun gun. Howse was charged with going armed with a dangerous

weapon concealed on or about her person in violation of Iowa Code section 724.4(1). Howse waived her right to a jury trial, and a bench trial was held on October 16. During the bench trial, testimony was given regarding stun guns, Tasers, and the specific stun gun found in Howse's purse.

**A. Officer Jurgensen's Testimony.** Officer Jurgensen is a patrol officer with the Waterloo Police Department. He has been trained to use a Taser by the Black Hawk County Sheriff's Department, the Iowa Law Enforcement Academy, and the Waterloo Police Department. He carries a Taser as part of his job, has been Tased himself, and has Tased people while on the job.

Officer Jurgensen was asked to describe the difference in how it feels to be Tased and how it feels to be stunned by a stun gun.

> Q: Have you ever been Tased, officer? A: Yes.
>
> Q: What do they feel like? A: It's a unique experience, but every single muscle on your body tightens up, and you can't move.
>
> . . . .
>
> Q: So, I think you described what it feels like to be Tased. Is it a separate feeling, then, when it's just a stun gun? A: Yes.
>
> Q: And what does that feel like, then? A: It's more of a pain.
>
> Q: Okay. So, it's not as severe as a Taser? A: It's not as long.

He described a stun gun as a "pain compliance" tool, whereas a Taser with probes would result in a "full-body lockup." He clarified that the device found in Howse's purse was a stun gun and not a Taser.[1]

---

[1]Officer Jurgensen testified that the difference between a Taser and a stun gun is that a Taser has probes that shoot out of it while a stun gun has to be applied to a

When asked if a stun gun is capable of incapacitating someone, he answered in the affirmative.

Officer Jurgensen did not test the stun gun when he took it from Howse's purse because "[a] stun gun . . . is dangerous." Because Officer Jurgensen did not test the stun gun, he could not testify as to its specific voltage. However, he did testify that if it was in working order, it would emit an electrical current and the person using it could send as many currents as they wanted for as long as they continued to push the button.

Officer Jurgensen was also asked about a stun gun's ability to cause injury or death. When asked if a stun gun was capable of causing death if it was used in the manner for which it was designed, he answered no. He did, however, testify that a stun gun could result in death in certain situations, for example, if the stunned individual was under the influence of drugs or had a heart condition. He testified a stun gun was designed to incapacitate an individual so they could be arrested or prevented from fleeing.

**B. Officer Erie's Testimony.** Officer Greg Erie is a field training officer (FTO) for the Waterloo Police Department. He has been an FTO since 2008 and currently teaches defensive tactics and Taser usage. Like Officer Jurgensen, Officer Erie also testified that a stun gun is used for pain compliance, and unlike a Taser, it does not shoot out any prongs.

Officer Erie testified that the stun gun taken from Howse's purse was inoperable. He testified that he plugged it in and lights came on, but it did not function properly. He further testified that, if working properly, the stun gun would emit electricity between two probes. When contact is

_____

person's skin to shock them. Officer Greg Erie also testified that this is the difference between a Taser and a stun gun.

made with a person, the electricity causes pain that results in compliance or deterrence.

Officer Erie likened the shock from a stun gun to a layman's description of being electrocuted. He stated that most people would "probably jump" if they were touched with an active stun gun. This is in contrast to being Tased, which "causes [a person] to lock up, fall down. It causes neuromuscular incapacitation." Officer Erie was also asked whether a stun gun would be capable of immobilizing someone and testified:

> Q: Okay. So, would a Taser immobilize a person?
> A: Yes, Tasers do that.
>
> Q: Would a stun gun immobilize a person? A: If they're standing?
>
> Q: Yes. A: No, 'cause if you stick it on, they jump—they jump back, so—
>
> Q: So, in your opinion a stun gun is more to get them to do what you want them to do? A: Exactly.
>
> . . . .
>
> Q: If you place the device on the individual's neck or head, will that incapacitate the person? A: You know, it's hard to say. Different people have different tolerances for it . . . . It's just because of the sensitivity of the neck, and there's a lot of things in there that—a lot of different arteries leading to the brain, that if it's interrupted by electrical current, you know, it could potentially cause them to fall down or pass out or something.

**C. District Court Decision.** After the bench trial, the district court found the State had demonstrated the stun gun was a dangerous weapon as defined under Iowa Code section 702.7. Howse was found guilty of carrying a weapon in violation of Iowa Code section 724.4. Howse was sentenced on December 6 and subsequently filed a notice of appeal on December 11. We transferred the case to the court of appeals.

The court of appeals held there was insufficient evidence the stun gun was a dangerous weapon under Iowa Code section 702.7 and reversed the conviction.

The State filed an application for further review, which we granted.

## II. Standard of Review.

"To the extent [Howse's] appeal involves questions of statutory interpretation, we review for correction of errors at law." *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). Howse also claims that the State did not produce sufficient evidence to convict her of the weapons-carrying charge, as the State failed to prove the inoperable stun gun was a dangerous weapon. We review a challenge to the sufficiency of evidence for correction of errors at law. *See State v. Showens*, 845 N.W.2d 436, 439 (Iowa 2014). We "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it." *Id.* at 439–40 (quoting *Romer*, 832 N.W.2d at 174). Evidence is substantial when "a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt." *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). If evidence only raises "suspicion, speculation, or conjecture," it is not substantial evidence. *Id.* (quoting *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996)).

## III. Analysis.

After the bench trial, the district court found that the State demonstrated all three elements of the offense of carrying a weapon: the defendant was armed with a stun gun, the stun gun was concealed on or about the defendant's person, and the stun gun was a dangerous weapon. *See* Iowa Code § 724.4(1). It is the third element—whether the

stun gun was a dangerous weapon under Iowa Code section 702.7—that we address.

**A. Error Preservation.** The State claims Howse failed to preserve error on the sufficiency-of-the-evidence claim now being asserted. "When . . . a [sufficiency-of-the-evidence] claim is made on appeal from a criminal bench trial, error preservation is no barrier." *State v. Anspach*, 627 N.W.2d 227, 231 (Iowa 2001); *see also State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997). The State does not dispute this legal proposition. What the State does object to are the new legal challenges—elemental challenges to questions of law—which cannot be raised for the first time on appeal. *See, e.g., Meier v. Senecaut*, 641 N.W.2d 532, 537–38 (Iowa 2002); *State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999).

The court of appeals rejected the State's preservation of error argument, as do we. Appellate courts "do not review issues that have not been raised or decided by the district court." *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). However, whether addressed as a matter of statutory interpretation or sufficiency of the evidence, the question argued and decided by the trial court was whether the stun gun found in Howse's purse comes within the statutory definition of a "dangerous weapon."

We were faced with a similar question of error preservation in *Geier* when we noted:

> [A]s a general matter, "[t]he grounds of a motion for new trial must stand or fall on exceptions taken at trial and a party cannot in a post verdict motion amplify or add new grounds as a basis for relief." However, we need not rest our resolution of this issue on the principles of error preservation insofar as we conclude that Geier's argument fails on the merits.

484 N.W.2d at 170 (quoting *State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975)) (citation omitted). Because we find Howse's argument that a stun

gun is not a dangerous weapon under Iowa Code section 702.7 fails, we decline to resolve the issue on the principles of error preservation.

**B. The Stun Gun.** Iowa Code section 724.4(1) provides that, "[e]xcept as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person . . . commits an aggravated misdemeanor." Iowa Code § 724.4(1). At issue in this case is whether an inoperable stun gun qualifies as a "dangerous weapon." Dangerous weapon is defined in Iowa Code section 702.7 as:

> [A]ny instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed, except a bow and arrow when possessed and used for hunting or any other lawful purpose. Additionally, any instrument or device of any sort whatsoever which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon. Dangerous weapons include but are not limited to any offensive weapon, pistol, revolver, or other firearm, dagger, razor, stiletto, switchblade knife, knife having a blade exceeding five inches in length, or any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person.

*Id.* § 702.7.

In 2008, after our decision in *Geier*, the Iowa legislature amended the statute to add the following language to the specific list of items the legislature defines as dangerous weapons: "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." 2008 Iowa Acts ch. 1151, § 1 (codified at Iowa Code § 702.7).

In reviewing the statute, there are three approaches which can be used to analyze whether an instrument or device meets the statutory definition of a dangerous weapon: (1) an instrument or device which is

"designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed"; (2) an instrument or device "which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being"; or (3) an instrument or device listed in the statute that has been defined as a dangerous weapon per se, one of which is "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." Iowa Code § 702.7.

This approach to analyzing the definition of a dangerous weapon is consistent with our decision in *State v. Durham*, where we rejected the defendant's argument that the weapons listed in the last sentence of section 702.7 are not dangerous unless they also fit under the first or second sentence of the statute. 323 N.W.2d 243, 244–45 (Iowa 1982). We found in that case that the plain language of the statute supported the state's position that the listed items in the final sentence of section 702.7 are dangerous weapons per se. *Id.* Although *Durham* was decided before the 2008 amendment adding "portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person" to the list, the holding and rationale remain the same. There is nothing in the legislative history of the amendment to suggest that the legislature intended to depart from this per se approach. Rather, the legislature intended to add another per se dangerous item to the already-existing list included in the statute.

The second path—a device "which is actually used in such a manner as to indicate that the defendant intends to inflict death or

serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being"—is not at issue in this case, as Howse did not actually use the stun gun found in her purse. Iowa Code § 702.7. However, the first and third paths are at issue, and we address each in turn.

1. *Path one.* The first sentence of the statute provides that a dangerous weapon is

> any instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed.

*Id.* The parties disagree both as to whether stun guns are *designed* to inflict injury or death and whether this particular stun gun was *capable* of inflicting death.

In *Geier*, we addressed the question of whether an operable stun gun fit the definition of a dangerous weapon under the first sentence of the statute.[2] 484 N.W.2d 167, 170–72 (Iowa 1992). We first addressed the definition of "injury upon a human being" and concluded that it is synonymous with the term "bodily injury." *Id.* at 171. We previously adopted the Model Penal Code definition of bodily injury, which is "physical pain, illness or any impairment of physical condition." *Id.* (quoting *State v. McKee*, 312 N.W.2d 907, 913 (Iowa 1981)); *see also* Model Penal Code § 210.0(3), 10A U.L.A. 300 (2001). We then addressed whether Geier's stun gun was capable of causing death. The testimony in *Geier* was that the stun gun was capable of causing death if used in

---

[2]At the time we decided *Geier*, the legislature had not yet amended section 702.7 to include "portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person" in the definition of dangerous weapon. *Compare* Iowa Code § 702.7 (2007), *with* Iowa Code § 702.7 (2011).

the head or neck region. *Id.* We concluded this testimony, in addition to testimony about the voltage of the stun gun, exceeded the threshold necessary to sustain the court's finding that a stun gun is a dangerous weapon as that term is defined in section 702.7. *Id.* at 171–72.

It is not necessary to the resolution of this case that we rely on the analysis utilized in *Geier*. However, that approach remains an appropriate method by which to analyze whether an instrument or device falls under the definition of a dangerous weapon under Iowa Code section 702.7.[3] Here, we are able to decide the issue on the last sentence—or third path—following the adoption of the 2008 legislative amendment.

2. *Path three.* We next turn to a discussion of the last sentence of Iowa Code section 702.7. A dangerous weapon is also "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." Iowa Code § 702.7. The defense argues that a stun gun cannot be considered a dangerous weapon under the last sentence of section 702.7 because stun guns were not designed to immobilize, but rather to cause pain. The State counters that this is simply a matter of semantics.

We are asked to determine whether a stun gun falls under the definition of a "portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." *Id.* When we are asked to interpret the language of a statute, we apply well-settled principles of statutory interpretation:

---

[3]We do not overturn the decision in *Geier*. In *Geier*, we determined there was sufficient evidence presented at trial to determine the defendant's stun gun was a dangerous weapon under the first sentence of the statute (path one). *Geier*, 484 N.W.2d at 172.

> The purpose of statutory interpretation is to determine the legislature's intent. We give words their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law. We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent. When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases. We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction.

*Schaefer v. Putnam*, 841 N.W.2d 68, 75 (Iowa 2013) (quoting *Romer*, 832 N.W.2d at 176). Further, "[w]ords are ambiguous if reasonable persons can disagree as to their meanings." *State v. Ahitow*, 544 N.W.2d 270, 272 (Iowa 1996) (quoting *Am. Asbestos Training Ctr., Ltd. v. E. Iowa Cmty. Coll.*, 463 N.W.2d 56, 58 (Iowa 1990)). We do not find that the language of the statute is ambiguous.

The legislature's definition in section 702.7 is consistent with a number of dictionary definitions of the term "stun gun." Merriam-Webster defines a stun gun as "a weapon designed to stun or immobilize (as by electric shock) rather than kill or injure the one affected." *Merriam-Webster's Collegiate Dictionary* 1240 (11th ed. 2014); *see also Stun Gun Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/stun%20gun (last visited Feb. 8, 2016) ("a gun that produces an electric shock which makes someone unconscious or stops someone from moving"); *Stun Gun Definition*, Dictionary.com, http://dictionary.reference.com/browse/stun-gun (last visited Feb. 8, 2016) ("a battery-powered, hand-held weapon that fires an electric charge when held against a person and activated by a trigger or button, used, especially by police, to immobilize a person briefly and without injury"); *Stun Gun Definition*, The Colombia Electronic Encyclopedia, http://encyclopedia2.thefreedictionary.com/stun+gun (last visited Feb. 8, 2016) ("hand-held electronic device that produces a high-voltage pulse

that can immobilize a person for several minutes with no permanent damage in most cases").

It is clear that the legislature's intent in section 702.7 was to provide a generic description of a stun gun or Taser. In doing so, it would not be necessary in each case to provide evidence and prove that every particular stun gun is capable of emitting high voltage and immobilization. The legislative definition provided in section 702.7 almost directly mirrors a number of generic dictionary definitions of the term stun gun. A reasonable person reading the definition in section 702.7 would likely consider it a description of a stun gun.

This generic definition that encompasses both stun guns and Tasers avoids many of the pitfalls that occurred in this case. Here, a significant portion of the testimony centered on an explanation of the difference between a stun gun and a Taser. At times, the words were used interchangeably.

> Q: Have you ever been Tased, officer? A: Yes.

> Q: What do they feel like? A: It's a unique experience, but every single muscle on your body tightens up, and you can't move.

> Q: Okay. Can you specifically describe what type of Taser was found on the defendant? A: Yep. This type is a stun gun only. There's no probes that come out of it. It appears that it's just for the stun gun purposes.

> Q: Okay. So, is it still able to incapacitate someone? A: Yes.

> Q: Do you know what the voltage would be on that type of device? A: I'm not familiar with this type of Taser— or, stun gun, no.

The definition provided by the legislature avoids this dilemma as the definition encompasses both types of weapons. There is no need to question witnesses regarding whether the specific stun gun or Taser

involved in the case produces a certain amount of voltage, and no need to delve into the difference between immobilize versus incapacitate.

This is consistent with our approach in other path three or per se dangerous weapon cases. In the past, after we have found that an item listed in the last sentence of section 702.7 is a per se dangerous weapon, we have also found that the State need not demonstrate operability. *See State v. Hemminger*, 308 N.W.2d 17, 20 (Iowa 1981); *State v. Nichols*, 276 N.W.2d 416, 417 (Iowa 1979); *State v. Ashland*, 259 Iowa 728, 730, 145 N.W.2d 910, 911 (1966). As we have previously explained:

> A gun in the hands of a robber and pointed at the victim causes fear of death or injury and is so intended. The law does not contemplate that a victim under such circumstances must inquire if the gun is loaded. Neither does the law contemplate that there was no use of a dangerous weapon if it should be subsequently determined that the gun was in fact unloaded.

*Ashland*, 259 Iowa at 730, 145 N.W.2d at 911. Similarly, a stun gun in the hands of a perpetrator and pointed at a victim also causes fear of injury or death, depending upon the victim's circumstance. We likewise do not put the responsibility on the victim to determine whether the stun gun or Taser being pointed at them is charged.

This is consistent with the approach of other states that have expressly defined stun guns as weapons or dangerous weapons. Some states have explicitly included the word "stun gun" in their list of weapons. N.J. Stat. Ann. § 2C:39–1(*r*)(4) (West, Westlaw current through L. 2015, ch. 216 and J.R. No. 13) (defining weapons to include "stun guns"); Or. Rev. Stat. Ann. § 166.360(10) (West, Westlaw current through 2015 Reg. Sess.) (defining "weapon" to include "[a]n electrical stun gun or any other similar instrument"); S.D. Codified Laws § 22-1-2(10) (Westlaw current through 2015 Reg. Sess.) (defining "dangerous weapon" as "any

firearm, stun gun, knife, or device. . . which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm").

However, other states have taken the same approach as the Iowa legislature and defined stun gun in broader terms. Connecticut defines an "electronic defense weapon" as a "weapon which by electronic impulse or current is capable of immobilizing a person temporarily, but is not capable of inflicting death or serious physical injury, including a stun gun or other conductive energy device." Conn. Gen. Stat. Ann. § 53a-3(20) (West, Westlaw current through 2015 Reg. Sess. and June Special Sess.). Idaho defines a "conducted energy device" as "any item that emits an electrical current, impulse, wave or beam, which current impulse, wave or beam is designed to incapacitate, injure or kill." Idaho Code Ann. § 18-3325(5) (West, Westlaw current through 2015 Reg. First Extraordinary Sess.). In other contexts outside the definition of "dangerous weapon," some states use a similar definition to the one found in section 702.7. For example, in Michigan, a state statute prohibits the sale and possession of "a portable device or weapon from which an electrical current, impulse, wave, or beam may be directed, which current, impulse, wave, or beam is designed to incapacitate temporarily, injure, or kill," unless specific exemptions apply. Mich. Comp. Laws Ann. § 750.224a(1) (West, Westlaw current through P.A. 2016, No. 8 of 2016 Reg. Sess.). Similarly, Massachusetts law criminalizes the possession of "a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." Mass. Gen. Laws Ann. ch. 140, § 131J (West, Westlaw current through 2015 1st Annual Sess.). In each case, the legislature

has defined a stun gun as a weapon or as a dangerous weapon. We are required to give words their ordinary and common meaning. A stun gun, even if inoperable, is per se a dangerous weapon under the definition contained in the last sentence of Iowa Code section 702.7. Therefore, substantial evidence supports Howse's conviction for carrying a weapon in violation of Iowa Code section 724.4(1).

**IV. Conclusion.**

We hold that a stun gun, even if inoperable, is per se a dangerous weapon under the definition of Iowa Code section 702.7. We vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**