# IN THE COURT OF APPEALS OF IOWA

No. 18-1382
Filed October 9, 2019

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**LOGAN SHOEMAKER,**
　　　　Defendant-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Tom Reidel, Judge.


The defendant appeals his convictions for attempted murder, willful injury causing serious injury, and robbery in the first degree. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, (until withdrawal) and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.


Considered by Potterfield, P.J., and Doyle and Greer, JJ.

**POTTERFIELD, Presiding Judge.**

Following a multiple-day spree of criminal activity in September 2017, Logan Shoemaker was charged with thirteen crimes. He pled guilty to eight charges and, following a jury trial, was convicted of four others.[1] On appeal, he challenges three of his convictions from the jury trial—attempted murder, willful injury causing serious injury, and robbery in the first degree.

Shoemaker maintains there is insufficient evidence to support his convictions for attempted murder and willful injury causing serious injury because the State failed to prove he had the specific intent to cause death or serious injury, respectively. He challenges his conviction for robbery in the first degree, claiming there was insufficient evidence to support that he intended to commit a theft—a necessary element of robbery—and maintains counsel provided ineffective assistance by failing to move for judgment of acquittal on that ground. Similarly, he also maintains counsel provided ineffective assistance by failing to request a separate instruction defining theft for the jury.

**I. Background Facts and Proceedings.**

Throughout September 2017, Shoemaker harassed a woman he knew, Katie, who had allowed him to stay in her home when he told her he had nowhere else to go. Shoemaker refused to leave Katie's home when she told him he was no longer allowed to stay there, and Katie had to involve the local police to force him to leave. Afterward, Shoemaker continued calling and texting

---

[1] Shoemaker pled guilty to two counts of theft in the second degree, one count of stalking with a dangerous weapon, three counts of criminal mischief in the second degree, one count of assault with a dangerous weapon, and one count of criminal mischief in the fourth degree.

Katie in a harassing manner; she called the police for assistance a number of times over the following two weeks.

Then, in the early morning hours of September 24, Shoemaker ramped up his behavior.  He used a truck he stole as a battering ram, purposefully crashing into vehicles parked near Katie's home.  He also used an instrument to break windows out of vehicles.  At one point when Katie came outside to ask Shoemaker to stop he, according to Katie's testimony, "started fighting [her], like beating [her] up."  Shoemaker only stopped after one of Katie's neighbor's pointed a gun out of a nearby window and told Shoemaker to leave.  Katie contacted law enforcement, but they were unable to apprehend Shoemaker at that time.

On the morning of September 25, police located the stolen truck and found Shoemaker sleeping inside.  They ordered him out of the vehicle, but he drove away.  A number of officers began pursuing Shoemaker.  Shoemaker continued to flee, eventually driving onto a gravel road, where he crashed into the back of a stopped garbage truck.  The stolen truck was inoperable after the collision.  Shoemaker ran up to the garbage truck and ordered the driver to exit, threatening to shoot him if he did not do so.  The driver exited, and Shoemaker continued to flee in the garbage truck, sometimes reaching speeds over seventy miles per hour.  At times, Shoemaker maneuvered the truck well—he successfully rounded corners traveling much faster than posted speed limits and, at one point, when an officer ahead of him in the road deployed stop sticks,

Shoemaker was able to steer around them by taking the ditch for a short time before reentering the road.[2]

As the pursuit continued elsewhere, Police Chief Terry Behning located an intersection that Shoemaker had not yet reached. Chief Behning parked his police vehicle in the opposite lane of the road on which Shoemaker was traveling, facing toward Shoemaker as he drove up. Chief Behning activated the red and blue lights on the vehicle before getting out and standing behind it, intending to throw out stop sticks at the last second so Shoemaker would not be able to avoid hitting them. Shoemaker crashed the garbage truck into Chief Behning's service vehicle. Just before impact, he was traveling sixty-one miles per hour. According to Chief Behning's testimony, his service vehicle "basically just exploded. I mean, it just came right at me and I had nowhere else to go." He incurred a number of serious injuries as a result; he was taken by helicopter to the hospital, where he stayed for approximately five weeks. While there, he underwent fifteen surgeries.

Shoemaker was apprehended immediately after he crashed into Chief Behning's vehicle. On the recording from one of the squad cars, the apprehending officers can be heard pointing out Chief Behning laying in the ditch to Shoemaker, who responded, "What happened?" Shoemaker followed up, asking, "Did I hit him? Did I hit the officer?"

At trial, one of the officers pursuing Shoemaker testified he was able to see Chief's Behning's vehicle about eleven seconds before Shoemaker crashed

---

[2] The police cars following Shoemaker were able to capture and record what occurred in front of them; a number of these recordings were admitted at trial and played for the jury.

into it.[3]  The officer opined that Shoemaker would have been able to see the service vehicle sooner, as he was in the lead vehicle and also sat higher in the garbage truck than the officer did in his squad vehicle.  Chief Behning can be seen standing outside of the vehicle in the video from the squad car.

The Iowa State Trooper who was called in to complete the technical collision investigation, James Lancaster, testified there was "no pre-impact roadway evidence at this scene."  When asked what that meant, Trooper Lancaster testified, "Pre-impact evidence is indicative of evasive action, panic braking, swerving, anything that was an attempt to avoid a collision that was about to happen."

Shoemaker testified in his own defense.  He admitted stealing multiple pickup trucks, purposefully ramming cars and smashing out windows near Katie's home while also stalking her, leading the police on a high-speed chase, and threatening the life of the garbage-truck driver before racing off in the garbage truck.  But he denied intentionally hitting Chief Behning's vehicle.  He stated he had never driven a large truck like the garbage truck and had also never driven from what is typically the passenger side of the vehicle, which he did here.  He testified he had trouble driving the truck and "could not keep it in the lanes."  He noted he "clipped" a Jeep while turning a corner in the garbage truck because he did not "know whether to turn wide or to turn short."  Shoemaker testified he purposefully drove in the opposite lane—the lane in which Chief Behning was

---

[3] The officer did not give an amount of time; while the video played in open court, he indicated that when he stated on the video, "Coming up on another vehicle," it was Chief Behning's vehicle that he was able to see.  Based on the timing on the video itself, this occurred approximately eleven seconds before impact.

parked—as he approached the intersection in order to avoid the rumble strips in the right-hand lane but that he intended to "come at the squad car and come around and take that right." When asked why he was not braking at the time he hit Chief Behning's vehicle, Shoemaker testified he was "bracing himself for impact." He maintained that at the time he hit the service vehicle, he was not aware Chief Behning was standing behind it. Shoemaker said it was not his intention to hit the police vehicle "[b]ecause [he] was trying to get away and hitting the squad car would have disabled the truck that [he] was in."

The jury found Shoemaker guilty as charged with attempted murder and willful injury resulting in serious injury for crashing the garbage truck into Chief Behning's service vehicle. He was convicted of robbery in the first degree for his actions involving taking and using the garbage truck and was also convicted of eluding. He was later sentenced to a term of imprisonment.

Shoemaker appeals his convictions of attempted murder, willful injury resulting in serious injury, and robbery in the first degree.

**II. Discussion.**

**A. Sufficiency of the Evidence.**

Shoemaker challenges the sufficiency of the evidence supporting his convictions for attempted murder and willful injury causing serious injury. Both convictions are based on the same conduct—Shoemaker crashing the garbage truck into Chief Behning's police vehicle. Shoemaker maintains his convictions cannot stand because the State failed to establish he had the specific intent to cause death or serious injury to Terry Behning when he crashed into him.

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). "We 'consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it.'" *Id.* (citation omitted). "Evidence is substantial when 'a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt.'" *Id.* (citation omitted).

Shoemaker relies on his own testimony to support his claim—specifically his testimony he did not mean to hit the service vehicle with the garbage truck and did not see Chief Behning before the collision. He argues his testimony is corroborated by the recording in which he can be heard asking the apprehending officers "what happened?" and "did I hit him" after they pointed out Chief Behning to him. Additionally, he argues that, as someone who was taking drastic steps to elude police capture, it would not make sense for him to purposefully crash his getaway vehicle.

The jury was not required to find credible Shoemaker's testimony that the crash was unintentional. *See State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992) ("Assessment of a witness's credibility is uniquely within a lay jury's common understanding."). The testimony of the officer pursuing Shoemaker established that Shoemaker was able to see Chief Behning's service vehicle for several seconds before the collision. And the recording from the officer's squad car clearly shows Chief Behning standing outside near his service vehicle. Still, Shoemaker chose to intentionally drive in the left-hand land, directly at the service vehicle. The only reason Shoemaker provided for driving in the "wrong"

lane was to avoid the rumble strips that warn of a stop ahead. Moreover, from the video admitted at trial, it is apparent Shoemaker was not applying the brake at the time he hit Chief Behning's vehicle, and, according to the trooper who completed the technical collision investigation, there was no evidence Shoemaker took evasive action before impact. Whether it makes sense to intentionally crash a getaway car, Shoemaker established his willingness to use the vehicle he was driving as a battering ram several times during his two-day crime spree.

Sufficient evidence exists to support the jury's conclusion that Shoemaker specifically intended to cause the death and serious injury of Chief Behning when Shoemaker crashed the garbage truck into the service vehicle.

**B. Ineffective Assistance of Counsel.**

Shoemaker claims he received ineffective assistance from trial counsel.[4] He maintains there was insufficient evidence to establish that he committed a theft—a necessary element of robbery—and argues counsel should have moved for judgment of acquittal on that ground. More specifically, Shoemaker argues the State failed to establish he intended to permanently deprive the owner of the garbage truck of their property when he took it. *See State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999) (providing that an intent to permanently deprive the owner of their property is an essential element of theft). Shoemaker also argues

---

[4] Shoemaker asserts a claim of ineffective assistance on direct appeal from the criminal proceedings. Because the judgment and sentence were entered before July 1, 2019, we are not prevented from deciding his claims by the amended Iowa Code section 814.7 (2019). *See State v. Macke*, ___ N.W.2d ___, ___, 2019 WL 4382985, at *1 (Iowa 2019) ("On our review, we hold Iowa Code sections 814.6 and 814.7, as amended, do not apply to a direct appeal from a judgment and sentence entered before July 1, 2019.").

counsel provided ineffective assistance by failing to request an instruction defining theft for the jury.

From the record before us, it seems counsel made a strategic choice to concede some of the elements of the various charges and focus the dispute on others. During opening argument, trial counsel conceded Shoemaker "is guilty of robbery" but maintained the jury should not find him guilty of robbery in the first degree for a number of reasons. Similarly, during closing argument, counsel stated, "There's a lot of words up there, but the first one says he specifically intended to commit a theft. [Shoemaker] did. Not contested." During the discussion regarding jury instructions, defense counsel stated, "We'll be stipulating that Mr. Shoemaker is guilty of robbery in the third degree, which would make lesser includeds pointless." The court then asked, "Mr. Shoemaker, do you agree with the statements by your attorney?" and Shoemaker indicated he did.

"[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibility of an attorney guaranteed a defendant under the Sixth Amendment." *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). "[S]trategic decisions made after a 'thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' [but] strategic decisions made after a 'less than complete investigation' must be based on reasonable professional judgments which support the particular level of investigation conducted." *Id.* (citation omitted). We recognize that conceding guilt of lesser-included offenses can be a valid trial

strategy. *See e.g.*, *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002) ("Though an unusual defense strategy, we have held that conceding guilt to one count of a multi-count indictment to bolster the case for innocence on the remaining counts is a valid trial strategy which, by itself, does not rise to the level of deficient performance."); *Brown v. State*, No. 14-1646, 2016 WL 351459, at *10 (Iowa Ct. App. Jan. 27, 2016) (rejecting claim counsel was ineffective for admitting defendant's guilt as to lesser counts because strategy was not unreasonable).

We are unable to reach the merits of Shoemaker's claims; the fighting issue is based on counsel's choice of a strategy, and the record is silent as to that issue. We will not just presume that because counsel made a tactical decision, it was a reasonable one. *See State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) (noting "we rarely address ineffective-assistance claims on direct appeal and instead preserve such claims" because "[t]he fact that a particular decision was made for tactical reasons does not, however, automatically immunize the decision from a Sixth Amendment challenge" (citation omitted)). We will not blindly credit Shoemaker's assertion that trial counsel conceded Shoemaker's guilt as to theft because counsel failed to recognize the potential issue regarding whether the evidence established Shoemaker's intent to permanently deprive the garbage truck owner of their property. For these reasons, though neither Shoemaker nor the State asks us to, we preserve the claims of ineffective assistance for further development of the record. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) (providing that if the court

"determines the claim cannot be addressed on appeal," the court is to preserve the claim for a postconviction-relief proceeding).

**III. Conclusion.**

Because substantial evidence supports Shoemaker's convictions for attempted murder and willful injury causing serious injury, we affirm. We cannot decide Shoemaker's claims of ineffective assistance of counsel on the record before us, so we preserve them for possible postconviction-relief proceedings.

**AFFIRMED.**