# IN THE COURT OF APPEALS OF IOWA

No. 23-1367
Filed January 28, 2026

**State of Iowa,**
Plaintiff–Appellee,

v.

**Spencer Antowyn Pierce Sr.,**
Defendant–Appellant.

Appeal from the Iowa District Court for Polk County,
The Honorable Scott D. Rosenberg, Judge.

**AFFIRMED**

Erin Carr of Carr Law Firm, P.L.C., Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney
General, attorneys for appellee.

Considered without oral argument
by Greer, P.J., and Schumacher and Ahlers, JJ.
Opinion by Schumacher, J.

1

**SCHUMACHER, Judge.**

A criminal defendant appeals his convictions for first-degree murder in violation of Iowa Code sections 707.1 and 707.2(1) (2022) and two counts of first-degree burglary in violation of sections 713.1 and 713.3. He asserts there is a lack of substantial evidence to support the convictions. Upon our review, we affirm.

## I. Background Facts & Proceedings

Spencer Pierce Sr. accompanied his granddaughter, K.P., to her place of employment, a fast-food business. Pierce was upset that two of K.P.'s coworkers allegedly sent pictures of their genitals to K.P. and messages that propositioned K.P. for sex. Pierce intended to speak to K.P.'s manager, Jarod White, about the photos and messages, which he thought were perpetrated by an employee named D.J. and another employee.

Pierce and K.P. entered the fast-food establishment, which is a "car hop" business with no interior seating. Rather, the business has drive-through service and an outdoor eating area. Customers and the public are not allowed in the building that houses the kitchen. The doors to the building have signs on them that state "employees only." One employee testified that only employees, food deliverers, and customers who place online orders are allowed within the building. But Pierce entered the business and requested to speak to the manager. There were several other employees present within the business.

Pierce and K.P. initially talked to White for about eight minutes, describing the harassment directed at K.P. and showing White the messages K.P. had received from D.J. During this conversation, Amanda Harris, another manager in training, was sitting nearby, counting money. Harris

testified that she did not hear everything that was said but remembered Pierce stating he wanted to beat up D.J. for "sexually assaulting my granddaughter," and that he would "driv[e] them outside and strip[] them naked and beat[] them." Pierce stated he would wait for D.J.'s shift to begin so he could confront him, stating "[I] hope he swings at me." During the conversation, Pierce also showed White an unrelated video from his phone of Pierce assaulting an individual at a gas station for harassing K.P and her friend. White responded to Pierce that D.J. would be fired when he showed up for his shift.

White then escorted Pierce and K.P. to the back of the building and called the general manager, James Carroll. Pierce and White both spoke to Carroll for a time, then White left Pierce alone for around five minutes to continue the conversation. Carroll stated that he agreed with Pierce that the situation was "unacceptable" and that D.J. would no longer have a job at the business. Pierce stated to Carroll, "I'd like to talk to him," to which Carroll responded, "Do whatever you need to do." After this conversation ended, White stated, "Now that he's off the phone, between you and me, I don't give a fuck what you do." White followed up with, "As a matter of fact, that patio has no cameras pointing at it."

Pierce, K.P., and White then left through the front door. Once outside, White told Pierce that an area by the dumpster could not be seen from the street. White and Pierce reentered the building for a time, and Pierce informed White that he would wait in his car. White responded he would get Pierce when D.J. arrived for work. Pierce and K.P. sat in their car for around twenty minutes. A short time later, White walked to the car and said something to Pierce and K.P.

K.P. and Pierce switched seats in the vehicle and drove to a nearby gas station. They returned and initially parked by the outdoor eating area. But they left that parking space and backed into a different space on the other side, near the drive-through window. Pierce then exited his vehicle and sat on the patio. Shortly thereafter, D.J. and two fellow employees—Brittany, and the eventual victim, J.W.—were dropped off at the business to begin their shifts.

Pierce followed them into the building while K.P. remained in the car. Harris, who was counting money at the time, testified that J.W. and D.J. walked behind her desk, and J.W. provided his identification and social security information because it was his second day on the job. Video evidence shows that Pierce also walked behind Harris as she worked, following J.W. and D.J.

White then informed D.J. that he was terminated from his employment. After alerting others that he was fired, D.J. left through the front door, and Pierce quickly followed. Pierce had an unfolded pocketknife in his right hand as he exited. Video evidence shows shadows, presumably of Pierce and D.J., exit the door and then Pierce hit D.J., causing D.J.'s hat to fly off his head and land in the drive-through lane. The video then shows D.J., in full view, reenter the building through the drive-through door. Pierce followed, empty-handed, into the building. At this point, K.P. exited the car, and ran into the fast-food business.

D.J., fleeing Pierce, passed by Harris, who was talking to J.W. at the desk. D.J. ran toward J.W., and J.W. pulled D.J.'s jacket to try to get D.J. to stay with him. J.W. was unsuccessful, and D.J. broke free and ran to the bathroom door. J.W. turned to face Pierce. Pierce pulled the unfolded pocketknife from his pant pocket with his right hand.

Pierce hit J.W.'s head with his left hand, and J.W. attempted to swing his fist at Pierce. Then Pierce, with his right hand, stabbed J.W. once in the side and once in the chest with the knife. J.W. ran away from Pierce. Several employees witnessed this altercation.

J.W. exited the building through one of the rear doors and ran toward a neighboring property. J.W. fell to the ground in the parking lot. After several attempts to stand, he collapsed for a final time. D.J. ran toward J.W., and Pierce followed for a few seconds before returning to the building with K.P. to retrieve his shoes, which had fallen off. Then Pierce and K.P. walked through the building, passed several employees, got into the car, and left the scene. All this activity was captured on security camera footage.

After emergency services arrived, Pierce returned to the scene and turned himself in. Law enforcement retrieved the pocketknife with a red substance from Pierce's pocket. J.W. died in the parking lot after attempts by emergency services to stabilize him. J.W.'s death was caused by a stab wound to his heart.

During an interview with law enforcement, Pierce stated that he went to the business with K.P. to tell management that K.P. was quitting because of sexual harassment. Pierce claimed that he intended to get physical with D.J. only if D.J. started an altercation. Pierce asserted that he was justified in his actions because he was attempting to protect his granddaughter.

Pierce was charged with one count of first-degree murder, two counts of first-degree burglary, and one count of going armed with intent. He elected to represent himself at trial with stand-by counsel. The jury found him guilty of all counts as charged. The district court sentenced Pierce to concurrent terms of incarceration: life imprisonment without the possibility of parole on

the murder conviction, twenty-five years on each burglary conviction, and five years on the going-armed-with-intent conviction.

Pierce now appeals, asserting there is insufficient evidence to support his convictions for the murder conviction and the burglary convictions.

## II.  Standard of Review

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). "We 'consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *Id.* (citation omitted). If substantial evidence supports a verdict, we will uphold it. *Id.* "Evidence is substantial when 'a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt.'" *Id.* (citation omitted). Evidence that qualifies as mere speculation, suspicion, or conjecture is not substantial. *Id.*

## III.  Discussion

### a.  First-Degree Burglary Convictions

Pierce asserts there was not substantial evidence to support his convictions of first-degree burglary. The jury was instructed the State had to prove the following elements of first-degree burglary:

> 1.     On or about March 7, 2022, Defendant broke, entered into, or remained in the [fast-food business], located at [address], Johnston, Iowa.
>
> 2.     The [fast-food business] was an occupied structure . . . .
>
> 3.     One or more persons were present in the occupied structure.

4. Defendant did not have permission or authority to enter into or remain in the [fast-food business].

5. The [fast-food business] was not open to the public.

6. Defendant did so with the specific intent to commit an assault.

7. a. During the incident, Defendant possessed a dangerous weapon;

or

b. Defendant recklessly or intentionally inflicted bodily injury on [D.J.] [or J.W.].

If the State of Iowa has proven all of the elements, Defendant is guilty of Burglary in the First Degree. If the State of Iowa has failed to prove any one of the elements, Defendant is not guilty of Burglary in the First Degree.

Pierce argues there was insufficient evidence to prove the fourth and sixth elements, namely, that he did not have permission to be present within the business and that he had specific intent to commit assault when entering the building.

Beginning with the fourth element, Pierce argues that he had permission to enter and remain within the business based on the words and actions of the managers, White and Carroll. Pierce asserts that White encouraged or at least acquiesced to his presence because White stated he did not "give a fuck" about what Pierce intended to do. Pierce also asserts that Carroll gave him permission to remain in the building by stating, "do whatever you need to do." Pierce points to the fact that he exited and reentered the building several times, and in response to Pierce saying he would return to his car for a time, White stated, "Alright, I'll get you as soon as [D.J.] gets here." Pierce also references the casual atmosphere of the

7

business, where none of the employees or managers indicated that he was not welcome within the building.

Consent to the presence of an individual within an occupied structure need not be expressly revoked, "it is sufficient that the [occupants'] actions give the defendant reason to know that such consent has been withdrawn." *State v. Walker*, 600 N.W.2d 606, 609 (Iowa 1999). But automatic revocation of permission does not necessarily occur "once the defendant commences his criminal conduct." *Id*. If a defendant has reason to know that permission has been withdrawn, "he has 'remained over' and, if, during the time he unlawfully remains . . . , he forms the requisite intent to commit a felony, assault, or theft, the defendant has committed a burglary." *Id*. Factors such as ordinary conversation with a defendant and an absence of a request to leave the premises may indicate implied consent for the initial entry into an occupied structure. *See State v. King*, 344 N.W.2d 562, 563 (Iowa 1983).

Here, the manager on duty, White, and his supervisor, Carroll, allowed Pierce to wander through the building, enter and exit freely, and stated that they consented to Pierce doing whatever he needed to do. Other employees did nothing when Pierce was within the building, and no one stated explicitly that Pierce should leave. But the record shows that when talking to Pierce outside, White, by stating there was an area by a dumpster outside, may have implied that he wanted Pierce to confront D.J. outside of the building.

When D.J. and J.W. arrived for their shift, Pierce confronted D.J. and pursued him. The record reflects that Pierce struck D.J. outside, knocking his hat off his head. D.J. then continued his retreat by returning inside the building and running through the kitchen area. Also, when Pierce physically confronted J.W. and punched him, J.W. responded by swinging at Pierce just prior to being stabbed. The other employees and managers present during

the pursuit and stabbing appeared on surveillance video to have reacted in a startled manner.

The jury was tasked with determining whether Pierce had consent to enter and remain within the business and whether such permission was impliedly or expressly revoked. "It is not our place 'to resolve conflicts in the evidence.'" *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (citation omitted). Rather, "the jury [is] to decide which evidence to accept or reject." *Id.*

Although Pierce may have initially possessed implied consent to enter and remain within the business, a reasonable jury could find that the reactions of the victims and other employees provided Pierce with "reason to know that such consent has been withdrawn." *See Walker*, 600 N.W.2d at 609 (listing cases the evidence was sufficient for the jury to "find that the defendant's privilege to be on the premises has been revoked even though the victim did not expressly tell the defendant to leave"). The State highlights Pierce's entry when he followed D.J. and J.W. into the building when they arrived for work and the entry when he chased D.J. back in the building with a knife. Harris testified at trial several times that non-employees have no permission to be inside the building. We find there was sufficient evidence for the jury to determine Pierce's privilege to remain within the business was impliedly revoked.[1] *See id.*

---

[1] There is also persuasive authority noting that a manager or employee of a business cannot grant permission to an individual to commit a crime such as assault, as such consent would be outside of the scope of employment. *See* Restatement (Third) of Agency: Employee Acting Within Scope of Employment § 7.07(2) (Am. L. Inst. 2024); *see also Martin v. Tovar*, 991 N.W.2d 760, 763–64 (Iowa 2023) ("We will find an employee's conduct outside the scope of employment if it substantially diverges from conduct that the employer actually authorizes.").

Turning to the sixth element, Pierce asserts that the evidence is insufficient to show he entered the business with the specific intent to commit an assault. Preliminarily, we point out that the relevant jury instruction stated that Pierce may be guilty of burglary if he "entered or *remained*" at the fast-food business "with the specific intent to commit assault." (Emphasis added.) "Proof of intent is usually offered in the form of circumstantial evidence, and the fact finder may infer intent from the circumstances of the defendant's entry and the acts preceding and following the entry." *State v. Gresham*, No. 12-2231, 2014 WL 69780, at *3 (Iowa Ct. App. Jan. 9, 2014). With regard to specific intent, the jury was instructed:

> "Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
>
> Because determining Defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine Defendant's specific intent. You may, but are not required to, conclude a person intends the natural result of his acts.

Relating to assault, the jury was instructed:

> An assault is committed when a person does an act which is intended to:
>
> 1. Cause pain or injury to another person; or
>
> 2. Result in physical contact which will be insulting or offensive to another; or
>
> 3. Place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person which coupled with the apparent ability to do the act.

A factfinder may determine whether intent to commit assault in the context of burglary exists based on "the circumstances of the defendant's

attempted entry into the premises and his acts preceding and following." *State v. Moeller*, No. 22-1635, 2023 WL 7391709, at *2 (Iowa Ct. App. Nov. 8, 2023).

Before D.J. and J.W.'s arrival, Pierce made statements of intended physical assault. But even if Pierce's alleged intent to commit assault before D.J. and J.W.'s arrival was in question, a jury could find his intent to commit assault manifested after they arrived at the business for their shift. After the employees arrived at the business, video evidence showed Pierce calmly following them inside, smiling. Then, after watching D.J. be terminated from employment, Pierce followed him outside and struck him. Pierce then continued to pursue D.J. inside the building, confronted J.W. with a knife in hand, and punched and stabbed J.W. *See State v. McFarland*, 598 N.W.2d 318, 321 (Iowa Ct. App. 1999) (noting that going armed with a weapon when entering or remaining in an occupied premise is a factor to consider when determining intent). Further, Pierce did assault both D.J. and J.W., which is an added inference that he intended his actions. *See State v. Lambert*, 612 N.W.2d 810, 814 (Iowa 2000) ("[H]is assaultive actions once inside[] constituted sufficient evidence from which a court could infer an intent to commit assault.").

We find substantial evidence supports the jury's determination that Pierce entered or remained at the business with specific intent to commit assault.

### b. First-Degree Murder Conviction

Pierce next asserts there was insufficient evidence to convict him of first-degree murder, alleging the State failed to prove he acted with malice aforethought and that he acted willfully, deliberately, premeditatedly, and

11

with specific intent to kill. The jury was instructed the State had to prove the following elements of first-degree murder:

1.      On or about March 7, 2022, Defendant stabbed [J.W.] . . . .

2.      [J.W.] . . . died as a result of being stabbed.

3.      Defendant acted with malice aforethought.

4.      a. Defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill [J.W.] . . . . [or] b. The defendant was participating in the offense of Burglary in the First Degree.

The jury was further instructed:

"Willful" means intentional or by fixed design or purpose and not accidental.

"To deliberate" is to weigh in one's mind, to consider, to contemplate, or to reflect.

"Premeditate" is to think or ponder upon a matter before acting.

"Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. Malice aforethought need not exist for any particular length of time.

Malice aforethought may be inferred from Defendant's use of a dangerous weapon.

Malice may be inferred from the commission of Burglary in the First Degree which results in death.

If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill.

Deliberation and premeditation need not exist for any particular length of time before the act.

As noted, the jury was instructed that they may infer malice aforethought if they found Pierce was engaging in first-degree burglary at the time of the incident. Even so, we choose to analyze the merits of Pierce's assertions concerning malice, willfulness, deliberation, and premeditation.

We begin the analysis with whether there was substantial evidence that Pierce acted with malice aforethought. Pierce argues that malice aforethought was not proven because he did not deliberate before stabbing J.W. and the incident resulted from a rapid physical altercation.

Here, the jury was instructed that it may infer malice aforethought merely because of usage of a dangerous weapon, which is the law of the case. *See State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (noting that when a "defendant does not object to the marshaling instructions, the marshaling instructions are the law of the case for purposes of reviewing the sufficiency of the evidence"); *see also State v. Burton*, No. 23-1411, 2025 WL 1822514, at *4 (Iowa Ct. App. July 2, 2025) ("[T]he use of a dangerous weapon 'also supports an inference of deliberation and premeditation.'" (quoting *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001))); *Reeves*, 636 N.W.2d at 25 (reiterating that the use of a deadly weapon also "supports an inference of malice"). Accordingly, we find no error in the jury's determination that Pierce acted with malice aforethought because of his employment of a pocketknife when assaulting J.W.

Even if the jury were not instructed to find malice absent deliberation through use of a dangerous weapon, there is substantial evidence that shows Pierce had an opportunity to deliberate. Pierce waited at the business for D.J. and J.W. to arrive. He followed D.J. out of the building and then back through the building. He approached J.W. with no provocation, punched him twice, then stabbed J.W. twice with his right hand while holding J.W. in place with

13

his left. These facts support the jury's determination that Pierce possessed malice aforethought with an opportunity to deliberate. *See State v. O'Shea*, 634 N.W.2d 150, 157 (Iowa Ct. App. 2001) (finding an inference of malice and deliberation existed when the defendant possessed a knife, left home, and used the knife intentionally to "stab an unarmed victim in the chest").

Regarding whether Pierce willfully, premeditatively, and deliberately, with a specific intent to kill when he stabbed J.W., Pierce asserts he was not planning to kill J.W. and the incident occurred suddenly and without reflection.

Starting with "willfulness," Pierce argues he did not plan to harm J.W. But Pierce used a knife and stabbed J.W. in the chest, piercing his heart. Pierce also acted first, punching J.W. twice before J.W. attempted to defend himself, moments before the stabbing. There is substantial evidence that Pierce willfully stabbed J.W. on purpose, with specific intent to kill.

Regarding deliberation and premeditation, Pierce asserts there is not substantial evidence that he planned to stab anyone. The record evidence demonstrates otherwise. Pierce had the knife in his pocket while waiting for D.J. and J.W. He followed them into the building after they arrived, then pursued D.J., eventually punching him in the head. Pierce then approached J.W. with the knife open and stabbed him multiple times. *See State v. Cory*, No. 14-1436, 2015 WL 7567527, at *6 (Iowa Ct. App. Nov. 25, 2015) (finding multiple attempts at inflicting injury with a deadly weapon imply malice, willfulness, deliberation, premeditation, and specific intent to kill).

The instructions allowed the jury to conclude that deliberation combined with use of a dangerous weapon demonstrated a specific intent to

kill, and we find substantial evidence supporting the jury's finding that Pierce acted with such specific intent to kill.

We find there was no error at law in the jury's determination that substantial evidence existed showing Pierce acted with malice aforethought, willfulness, deliberation, premeditation, and specific intent to kill when stabbing J.W. We affirm the conviction of first-degree murder.

## IV.     Conclusion

For the above reasons, we affirm the convictions for two counts of first-degree burglary and one count of first-degree murder.

**AFFIRMED.**