# IN THE COURT OF APPEALS OF IOWA

No. 19-0056
Filed June 17, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**VANCE ARCHILEE GOOD,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Richard H. Davidson, Judge.

Vance Archilee Good appeals from his conviction for first-degree murder. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Doyle and Schumacher, JJ.

**BOWER, Chief Judge.**

Vance Archilee Good appeals from his conviction for first-degree murder, contending there is insufficient evidence of robbery, malice aforethought, or premeditation to support the conviction. He also asserts the court abused its discretion in allowing a photograph of one of his tattoos to be viewed by the jury. Finally, he maintains the court erred in allowing "backdoor hearsay." Because there is substantial evidence to support the conviction, the trial court did not abuse its discretion in admitting the photograph, and we are not persuaded that the so-called backdoor hearsay "undermined Good's sole defense of self-defense" and denied him a fair trial, we affirm.

**I. Background Facts and Proceedings.**

The afternoon of March 21, 2018, Lee Johnson arrived by taxi at a homeless shelter "flashing a lot of money" and talking loudly. He had been drinking. Gary Comstock who worked the front desk described Johnson as a "little belligerent." Johnson and another resident, James McCauley, left for a time to go to a store and were told they had to return by 8:00 p.m.

At about 11:30 p.m., shelter resident Richard "Chief" Thompson needed to use the restroom. McCauley—also known as "Stretch"—would not let him enter the men's restroom. Thompson insisted. Thompson passed by Good at the restroom entrance to see Johnson standing by the smaller of two urinals, Cody Varnes standing at the sinks, and Brandon Hollis standing in the back. McCauley leaned against the first bathroom stall. Thompson described the situation as "[d]ead silence," "tension," "[i]t wasn't good. It was real ominous." Johnson looked "stressed." Good was standing with his chest "puffed out" and showed "anger."

Thompson saw no weapons, and no one spoke. Thompson left the restroom and went to his bunk. Thompson said that Varnes later ran into the dining room, "freaking out." McCauley and Good were "running around." Good was wiping off blood, and had blood on his arm.

At 11:31 p.m., motion-sensor shelter surveillance video shows Good and Hollis carrying Johnson's body outside the shelter, leaving a blood trail from the men's bathroom. Hollis is wearing a black vest and Good is wearing a long-sleeved gray shirt. The two return to the shelter. At 11:35 p.m., a shirtless Good goes to the front desk where he told Comstock that Johnson thought he was "going to get jumped," pulled out a razor knife and a scuffle ensued, and Good had "got the knife away from him and killed him." Good mentioned a drug deal and stated it had been self-defense. Hollis, McCauley, and Varnes were standing nearby when Good was talking with Comstock. Good told Comstock he had dragged Johnson outside. Good asked Comstock to help clean up the blood. Comstock called 911 and reported there had been a killing and relayed Good's claim of self-defense.

Surveillance video shows Hollis throwing something away in a trash can near the door at 11:38 p.m. At 11:39 p.m., Good exits the building and returns a few minutes later.

Responding officers found Good in the foyer on the north side of the building. Officer Benson and Officer Michael Brown placed Good in handcuffs. Good told Officer Brown he had defended himself after Johnson pulled a knife on him and he took the knife and killed Johnson. Good told Officer Brown "he didn't mean to kill the guy and that his military training had just kicked in." Good told him

"that if someone's trying to hurt you, can you protect yourself." Officer Benson placed Good into a police vehicle and read Good his rights. Without prompting or questioning, Good kept repeating "he didn't mean to kill him" and "his military training had kicked in." Neither officer observed any wounds on Good.

Johnson's body was located lying face down in the parking lot. Johnson's face and neck were slashed deeply, and he had additional stab wounds. Police found an empty wallet underneath his body.

Officers found a utility knife razor blade in the pool of blood in front of the water fountain at the entrance to the restroom. They located a utility knife handle (no blade) on Good's bunk. It could accommodate the blade found in the blood. The handle itself had no blood or fingerprints when it was later tested. Also found were a white undershirt and a grey shirt with what appeared to be blood on them.

Officers also located a black canister of red pepper spray in a corner outside the building. Officers found clothing in the trash can where Hollis had thrown something away.

Good was taken to an interview room at the police station and again read his rights. He spoke disjointedly about not knowing what had happened, talked about his own health, talked about how Johnson had cut himself while being robbed, and made other rambling comments. Good told the interviewers they dragged Johnson outside because they were scared and then they went to talk with Comstock. A bit later, Good said:

> I don't hunt, I don't fish, I didn't even know the fellow. I know, I can (inaudible) they do drugs, smoke weed or drink, people got that look. I don't know what his problem, I don't even know the fellow. Wow. The Lord would of done the same thing if doing that to him, going crazy and cutting himself, man, wow, the Lord would of saved my

life, probably done the same thing, was so quick. Wow. Sorry mother, was an accident, I don't know what went on. He was swinging the blade around, trying to cut me and stuff. I knocked it out of his hand, the dude was cutting on himself, man, I don't even know who he is, I ain't no killer, mamma, (inaudible) just a petty old kid that likes to take things from Walmart, get arrested and do my time, I don't even drive cars any more. I walk everywhere I go. Live at shelter, I don't leave the shelter much. (inaudible) young man, forgive his soul Lord. This blood stinks. Wow. My hand got blood on it, it stinks.

Hollis was later transported to the police station. Officer Brown noticed Hollis had blood on his vest, which was seized.

An autopsy revealed Johnson had sustained twelve "sharp force injuries," a combination of incised and stab wounds.[1] Four were deep incised wounds severing Johnson's windpipe, jugular veins, and carotid artery. There were incised wounds to his right upper eyelid, nose, and right cheek. There was a stab wound to the back of his neck. Two stab wounds to the chest, several inches deep, penetrated the lungs, heart, and pulmonary artery. There was one stab wound to the abdomen and one to the left thigh. The medical examiner did not think the stab injuries were consistent with a utility knife. They were consistent with a fish fillet knife. The wounds to the heart, and some of the wounds to the neck, were fatal. According to the autopsy report, Johnson's blood alcohol content was 0.18.

Good was charged with first-degree murder. He filed a notice of self-defense.

---

[1] The medical examiner testified an incised wound is "a cut; and the definition of that is if a knife—or to cut across the skin, and the length of the wound is greater than the depth of the wound." A stab wound "is if the tip of the knife went into the body so the depth of the wound is greater than the width of wound."

At trial, a waitress who had served Johnson in the afternoon, testified that Johnson came to her place of business and ordered a fish dinner and a beer. As she spoke with him, she thought he might have been intoxicated so she served him only one beer with his meal. She stated his meal was less than twenty dollars and he tried to give her a $100 tip, which she refused. She called a cab for him and gave them the address of the homeless shelter.

Comstock testified about his interactions with Johnson and the events of that evening. Like Comstock, Roger Bearfield testified Johnson was "flashing a lot of money" when he arrived at the shelter. He stated Good was there when Johnson was showing his money.

Varnes testified as part of a plea agreement.[2] In exchange for truthful testimony against Good, Varnes would face a charge of first-degree robbery, which carries a 17.5-year mandatory minimum prison term. If he then testified truthfully against McCauley, the charge would be further reduced to second-degree robbery, which carries a seven-year mandatory minimum. Varnes testified he had twice denied involvement in the attack on Johnson to police. But the third time he spoke to police, he chose to tell the truth.

Varnes testified Good approached him, claiming Johnson owed his family money. Good claimed Johnson had methamphetamine and money and "we were going to take it from him." Varnes agreed to help for a "little bit of the meth." The plan was for Varnes to get Johnson to the restroom "and tell him that a buy was ready to be made." Then, Varnes would go get McCauley, who was to "play[] the

---

[2] On cross-examination, Varnes acknowledged that in deposition he stated he was testifying against Good to avoid a murder trial.

part of the person dealing." Varnes was to rush in and spray Johnson with a canister of pepper spray provided to him by Good. Good would follow. Varnes testified he did not know Hollis was involved until after he entered the restroom and sprayed Johnson in the eyes with pepper spray.

Varnes testified Johnson tried to escape when Varnes sprayed him. Hollis tried to keep Johnson in the restroom. Good pushed Varnes out of the way. As Johnson struggled past, Varnes saw where Good had slashed Johnson's throat. Hollis attempted to push Johnson back into the restroom as Varnes pulled him back by the shirt. "And at that time, [Good] comes up to the side of [Johnson] and just starts stabbing him." Varnes stated Good was using a "fish fillet knife"—"[o]range handle, long skinny blade, sharp." Varnes testified he heard Good repeatedly say, "You're going to die, n*****. You're going to die." Then Hollis lost his footing, and Johnson "smashes into part of the wall and then drops to the floor right outside some drinking fountains." Varnes stated Hollis held Johnson down until he "bled out."

Varnes testified he and McCauley kept others from coming into the area. Good later handed them Johnson's wallet and "we went through it," finding "money, his identification cards, a few credit cards." Varnes stated Good took the money. "And then somewhere along the lines we ended up with a bag of meth. I can't remember if it came out of the wallet or if it came from [Good]." At that point, Varnes said Good and Hollis carried Johnson's body out and "me and [McCauley] are trying to get rid of all the evidence of us doing the crime as best as we could," such as the knife, the identification, the pepper spray. Varnes testified McCauley "tried to chuck [the pepper spray] onto the roof," "[a]nd it hit the very edge of the

roof and came right back, but we didn't go and grab it." When asked what happened to the knife, Varnes testified Good gave it to him and he first threw it into the restroom trash can. When Good and Hollis returned, Varnes asked what to do about the blood on the floor. Good said he would get a mop from the desk attendant. Varnes followed behind and said nothing when Good said he had "killed a guy" in self-defense. Varnes remembers having the knife again, wiping his prints from it, giving it to McCauley, who "took it into the dining area, and he handed it to somebody else." Varnes then tried to appear as though he had nothing to do with the event. Varnes testified he left the shelter ten to twenty minutes after the police arrived, leaving a note with his "name and number and explaining why [he] had left" before leaving the city.

The defense cross-examined Varnes vigorously, highlighting the number of statements Varnes had given to police and several inconsistences in his statements.

Officers Brown and Benson testified. Detective Amber Kennedy also testified she had interviewed Hollis at the scene on March 21, believing he was a witness to a homicide. After interviewing Hollis at the station, Detective Kennedy viewed the shelter's surveillance footage, which led to her re-interviewing Hollis. The following exchange then occurred:

> Q. Don't tell me, but I presume he gave you some more information? A. Yes, he did.
> Q. As a result of the information that he gave you, were there any—
> [DEFENSE COUNSEL]: Your Honor, I would object to the— on this line of questioning to—It's getting in what is implied hearsay.
> . . . .
> Q. Based on the information you then received from Mr. Hollis, did you make any charging decisions with regard to Mr. Hollis?

[DEFENSE COUNSEL]: Your Honor, I would just object again as implying that something was said in those comments that led her to do an act. So I would say that's implied hearsay there, Your Honor.

[PROSECUTOR]: May I respond, Your Honor?

THE COURT: You may.

[PROSECUTOR]: If it is hearsay, then it's effect on the hearer not for the truth of any matter asserted as to why she's taking the action she's about to take.

THE COURT: The objection's overruled. The witness may answer.

A. Yes. I did charge Mr. Hollis.

Q. What did you charge him with? A. He was charged with accessory of—accessory to a felony.

Additional law enforcement officers testified, as did the medical examiner.

The defense objected to the admission of a picture of Good taken at the police station in which he is shirtless. The trial court made the following record later:

> The court had asked to see Exhibit 30A that—[defense counsel] objected to the admission of that photograph. The picture depicted the defendant, Mr. Good, standing as viewed while in custody during the investigation. Mr. Good did not have a shirt on, and certain tattoos on his chest were visible. The court called the side bar to confirm the reasons for the defendant's objection. [Defense counsel] pointed out to the court a tattoo in the form of a swastika that was on the defendant's chest and argued that the tattoo is unfairly prejudicial. [Counsel] for the State argued the purpose of the exhibit was to show that Mr. Good had no injuries.
>
> The court overruled the objection, and Exhibit 30A was received along with the other photographs taken at the time of the defendant, Vance Good.
>
> . . . .
>
> THE COURT: The court overruled the objection to Exhibit 30A, [which] was received along with the other pictures taken at the time of the defendant, Vance Good. The swastika tattoo was rather small; and when published during the trial on a screen across the room from a jury, it would not have been noticeable. By holding the side bar, no attention was drawn to the tattoo. And even if the jury is to review the exhibit during deliberation, the court rules that the exhibit is not unduly prejudicial.

Ryan Petrucelli of the Iowa Department of Public Safety Criminalistics Laboratory testified concerning DNA findings from various items submitted by law enforcement. He testified Holllis's black vest indicated the presence of blood, which was a mixture of Hollis and Johnson. The razor blade found in the pool of blood had Johnson's DNA. The razor holder seized from Good's bed did not indicate blood on the blade insert area and Good was the major contributor of DNA in that area. Two areas sampled on a pair of gray pants found inside the trash can had a mixture of DNA profiles, but the major contributor was Johnson. Petrucelli testified about the testing of a green shirt taken from Good's bunk:

> Screening test indicated the presence of blood on four areas on the green T-shirt. Two areas were sampled for DNA. The DNA profile developed from the sample of the middle left area near the waist indicated a mixture of two individuals. The profile of the major contributor matched the known DNA profile of Lee Johnson.

Good's tennis shoes also indicated the presence of blood and the DNA profile of that blood matched Johnson's profile. The test of a swab of blood from Good's arm indicated the blood was Johnson's.

The defense moved for judgment of acquittal, arguing the State had failed to present evidence of a robbery, malice aforethought, or premeditation. The motion was overruled.

Richard Rapp testified for the defense that he was a resident at the shelter the night of March 21. He stated he heard a thud and then saw Good, who looked "shooken up," "worried," and "scared." Rapp testified,

> [Good] told me that the black guy had a knife and had shoved him, shoved him against the wall. Vance said that he grabbed the knife out of his hand and shoved the black guy back. And as he shoved him back, he accidentally got him in the neck. And he was really

shooken up that, you know—He said that he was going to jail for, you know—

    Q. Let me stop you there, Mr. Rapp. So after you talked to Vance Good, did he run off to talk to Gary? A. He ran off. I didn't know if he was going to talk to Gary or not . . . .

The defense then played the entire surveillance video for the jury and rested.[3]

The jury found Good guilty of first-degree murder.

On appeal, Good contends there is insufficient evidence of robbery (related to the felony-murder alternative), malice aforethought, or premeditation to support the first-degree murder conviction. He also asserts the court erred in two evidentiary rulings.

## II. Scope and Standard of Review.

We review challenges to the sufficiency of the evidence for correction of errors of law. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). Evidentiary rulings are normally reviewed for an abuse of discretion. *Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018).

## III. Discussion.

***A. Sufficiency of the evidence.*** We will not displace a jury verdict if substantial evidence supports it. *See State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003). "Evidence is substantial when 'a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt.' If evidence only raises 'suspicion, speculation, or conjecture,' it is not substantial evidence." *Howse*, 875 N.W.2d at 688 (citations omitted).

---

[3] Hollis had been subpoenaed to testify for the defense but failed to appear.

As noted, Good contends that—excluding Varnes's testimony—there is insufficient evidence of robbery, malice aforethought, or premeditation to support his conviction for first-degree murder. Good acknowledges Varnes's testimony provides substantial evidence to support each challenged element. Consequently, Good asserts Varnes's testimony was totally lacking in credibility and the jury was required to believe Good killed Johnson in self-defense. We disagree.

First, we note it is not for this court "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (citation omitted); *see also State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999) (stating "credibility was for the jury to decide"). Varnes was vigorously cross-examined concerning his various statements to the police in which he initial denied any involvement.

More than one witness testified Johnson had made no small show of having a large sum of cash. Thompson testified he walked into the restroom and saw Good, Johnson, Hollis, and McCauley standing silently and tensely. Good appeared "puffed out" and angry. This described situation could support an inference that Good and the others were intending to take Johnson's money. Johnson's empty wallet was found under his body, which had been dragged outside by Good and Hollis.

Varnes testified Good intended to take Johnson's money and drugs. He testified Good had a long-bladed fish fillet knife with him. He testified there was a concerted effort to keep Johnson from escaping while Good repeatedly stabbed

him in the neck and side. This testimony is sufficient to establish an intent to rob Johnson, malice aforethought, and premeditation.

Iowa cases have often recognized that "the use of a deadly weapon supports an inference of malice, and when accompanied by an opportunity to deliberate, also supports an inference of deliberation and premeditation." *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001); *accord State v. Frazer*, 267 N.W.2d 34, 39 (Iowa 1978) ("The use of a deadly weapon accompanied by an opportunity to deliberate, even for a short time, is evidence of malice, deliberation, and premeditation.")). To premeditate means "to think or ponder upon the matter before acting." *Buenaventura*, 660 N.W.2d at 48. "[P]remeditation need not exist for any particular length of time." *Id.*; *see also State v. Wilkens*, 346 N.W.2d 16, 20 (Iowa 1984) ("Deliberation and premeditation may be shown by circumstantial evidence in one of three ways: (1) evidence of planning activity of the defendant which was directed toward the killing; (2) evidence of motive which might be inferred from prior relationships between defendant and the victim; and (3) evidence regarding the nature of the killing." (citation omitted)).

In addition, Varnes's statements concerning seeing Good with a fish fillet knife comport with the medical examiner's findings of deep stab wounds, which were not consistent with a utility-type blade. The number and types of injuries contradict Good's claim that he got the utility knife away from Johnson and accidently stabbed him in the neck. The nature of the killing—the multiple stab wounds into the heart and lungs and the slicing wounds across Johnson's neck— provides substantial evidence establishing Good's opportunity to premeditate and deliberate before stabbing Johnson repeatedly. Consequently, there is substantial

evidence to support Good's conviction under either a felony-murder or premeditated-murder alternative.

**B. Photograph.** Good argues that the admission of the photograph showing his swastika tattoo was unfairly prejudicial.[4] He contends two officers testified they did not observe injuries on Good, so the photograph was cumulative evidence and unnecessary.

The district court allowed the one photograph as relevant to show Good did not have injuries and noted, "The swastika tattoo was rather small; and when published during the trial on a screen across the room from a jury, it would not have been noticeable." The court's reasoning was not "clearly untenable" or "clearly unreasonable." *State v. Walker*, 935 N.W.2d 874, 877 (Iowa 2019) ("An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" (citation omitted)).

Good asserted he acted in self-defense when Johnson was swinging a razor around. The photograph is the only full image of Good after the altercation. The State was entitled to show that Good did not sustain any injuries, which seems unlikely under his version of the altercation. We, like the district court, observe that the swastika tattoo is small and barely noticeable— especially given the numerous tattoos Good has on his body, most of which are much larger and attention grabbing. We find no abuse of discretion.

---

[4] Although we acknowledge a swastika has a negative connotation, we do not accept Good's characterization that the tattoo is evidence of prior bad acts.

**C. "Backdoor Hearsay."** Finally, Good asserts the court allowed backdoor hearsay. A "backdoor hearsay" problem occurs when a "question and answer [does] not produce hearsay 'in the classic or textbook sense,' [but] the questioning [is] nevertheless designed to circumvent the hearsay rule and present the jury with information from unsworn, out-of-court sources." *State v. Huser*, 894 N.W.2d 472, 497 (Iowa 2017) (citation omitted). Although "the form of [a] question [does] not literally require the jury to infer the subject matter," "the use of the 'don't tell me what [the other person] said' questioning directly after [the witness] testified about the [communication] was designed to encourage the jury to make the connection." *Id.* "The State 'is not permitted by means of the insinuation or innuendo of incompetent and improper questions to plant in the minds of the jurors a prejudicial belief in the existence of evidence which is otherwise not admissible and thereby prevent the defendant from having a fair trial.'" *Id.* (quoting *State v. Carey*, 165 N.W.2d 27, 32 (Iowa 1969)).

Good maintains that the question leading to Detective Kennedy's testimony that Hollis was charged with accessory to a felony "conveys to the jury that Hollis's statements incriminated him *and* Good as to being co-conspirators in the death of Johnson." Even if we assume the question was improper, we conclude Good suffered no prejudice.

There was testimony Johnson was "flashing a lot of money." Thompson had already testified Hollis was in the restroom with Johnson and others in a tense situation. Varnes testified that he, Good, and McCauley were planning to rob Johnson. Varnes also testified Hollis pushed an escaping Johnson back into the restroom and Good stabbed Johnson a number of times. Detective Kennedy's

testimony was that Hollis was first thought to be a witness only, but after viewing the surveillance video—which showed Hollis carrying Johnson's body out of the shelter—Hollis was questioned again and charged with accessory to a felony. What felony?  Murder?  Robbery?  Obstructing justice?  The jury was not told, and we are not persuaded that the so-called backdoor hearsay "undermined Good's sole defense of self-defense" and denied him a fair trial.  We therefore affirm.

**AFFIRMED.**